**No. 21-2115**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

**UNITED STATES OF AMERICA,**

**v.**

**FRANK NUCERA, JR.,
Defendant-Appellant**

**On Appeal from Judgment of Conviction and Sentence
in the United States District Court for the District Of New Jersey
No. 1:17-cr-00532-RBK-1 (Robert B. Kugler, J.)**

**BRIEF FOR APPELLANT**

*ROCCO C. CIPPARONE, JR., ESQUIRE*
**Law Offices of Rocco C. Cipparone, Jr.
205 Black Horse Pike
Haddon Heights, NJ 08035
(856) 547-2100
Fax: (856) 547-2225
www.CipparoneLaw.com**

*Counsel for Appellant*

# **TABLE OF CONTENTS**

STATEMENT OF JURISDICTION ................................................................ 1

STATEMENT OF ISSUES WITH PLACE RAISED AND RULED ON ........... 1

RELATED CASES ...................................................................................... 2

STATEMENT OF THE CASE ..................................................................... 2

SUMMARY OF ARGUMENT ................................................................... 11

ARGUMENT ........................................................................................... 14

    I.  The District Court Erred by Denying Appellant's New Trial Motion and by Denying an Evidentiary Hearing ............................................. 14

        1. Several Jurors Demonstrated Improper Bias and Engaged in Improper Conduct ...................................................................... 15

        2. Juror Richardson Made Misrepresentations and Concealed Biases During Voir Dire........................................................... 26

    II.  The District Court Erred by Precluding Admission of Statements Made by Alleged Victim Stroye........................................................... 42

    III. The District Court Erred by its Confusing Specific Unanimity Jury Instruction........................................................................................... 49

    IV. The District Court Erred in its Guideline Calculation .................. 52

    V.  The District Court's Sentence Is Unreasonable and the Court Incorrectly Interpreted Guideline Policy Statements ......................... 57

CONCLUSION .......................................................................................... 65

REQUIRED CERTIFICATIONS ................................................................. 66

CERTIFICATE OF SERVICE ..................................................................... 67

# TABLE OF AUTHORITIES

## CASES

*Alvarez v. Ercole*, 763 F.3d 223 (2d Cir. 2014) ........................................... 45

*Batson v. Kentucky*, 476 U.S. 79 (1986) ...................................................... 40

*Cunningham v. Shoop*, 11-3005 (6th Cir. Jan. 10, 2022**)** .............. 14, 26, 39

*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984) 26

*Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017) .................................... 23

*Smith v. Phillips*, 455 U.S. 209 (1982) .................................................. 25, 26

*U.S. v. Arturo Garcia*, 590 F.3d 308 (5th Cir. 2009) ................................... 54

*U.S. v. Bah*, 439 F.3d 423, 427 (8th Cir. 2006) .......................................... 54

*U.S. v. Baird*, 109 F.3d 856 (3d Cir. 1997) ................................................. 62

*U.S. v. Beros*, 833 F.2d 455 (3d Cir. 1987) ................................................. 49

*U.S. v. Cherry*, 10 F.3d 1003 (3d Cir. 1993) ................................................ 61

*U.S. v. Christie*, 624 F.3d 558 (3d Cir. 2010) .............................................. 45

*U.S. v. Claxton*, 766 F.3d 280 (3d Cir. 2014) .............................................. 39

*U.S. v. Edmonds*, 80 F.3d 810 (3d Cir. 1996) ............................................. 51

*U.S. v. French*, 904 F.3d 111 (1st Cir. 2018**)** ........................................ 14, 39

*U.S. v. Genao*, 343 F.3d 578 (2d Cir. 2003) ................................................ 56

*U.S. v. Green*, 617 F.3d 233 (3d Cir. 2010) ................................................ 42

*U.S. v. Hernandez-Bourdier*, 19-3738 (3d Cir. 2021) ................................. 22

*U.S. v. Holley*, 942 F.2d 916 (5th Cir. 1991) .................................................. 50

*U.S. v. Moore*, 375 F.3d 259 (3d Cir. 2004) .................................................. 42

*U.S. v. Noel*, 905 F.3d 258 (3d Cir. 2018) .................................... 14, 15, 39, 41

*U.S. v. North*, 910 F.2d 843 (D.C. Cir. 1990) .............................................. 49

*U.S. v. Resko*, 3 F.3d 684 (3d Cir. 1993) ........................................................ 21

*U.S. v. Russell*, 134 F.3d 171 (3d Cir. 1998) .......................................... 49, 51

*U.S. v. Ryan*, 828 F.2d 1010 (3d Cir. 1987) ................................................ 49

*U.S. v. Seibert*, 971 F.3d 396 (3d Cir. 2020) .............................................. 57

*U.S. v. Solomon*, 766 F.3d 360 (3d Cir. 2014) ...................................... 52, 57

*U.S. v. Sriyuth*, 98 F.3d 739 (3d Cir. 1996) .......................................... 42, 44

*U.S. v. Wilson*, 281 F. Appx. 96 (3d Cir. 2008) .......................................... 47

## STATUTES

18 U.S.C. § 1001 ........................................................... 9, 47, 52, 53

18 U.S.C. § 242 ..................................................................................... 9

18 U.S.C. § 249 ..................................................................................... 9

18 U.S.C. § 3231 .................................................................................... 1

18 U.S.C. § 3553 .......................................................................... 14, 57, 63

18 U.S.C. § 3742 .................................................................................... 1

28 U.S.C. § 1291 .................................................................................... 1

## RULES

Fed. R. Evid. 403 ...................................................................... 43, 44

Fed. R. Evid. 807 ............................................................... 42, 47, 48

LAR 30.3 ..................................................................................... 2

U.S.S.G §5A (Sentencing Table) ................................................ 52

U.S.S.G. §2B1.1 .............................................. 13, 52, 53, 54, 55, 56

U.S.S.G. §2H1.1 ................................................. 13, 52, 53, 56, 57

U.S.S.G. §5K2.0 ...................................................................... 58

U.S.S.G. §5K2.7 .......................................................... 14, 61, 62

U.S.S.G. §5K2.9 .......................................................... 14, 57, 61

## STATEMENT OF JURISDICTION

Subject Matter Jurisdiction: 18 U.S.C. § 3231. Appellate jurisdiction: 28 U.S.C. § 1291; 18 U.S.C. § 3742 (a)(1). Judgment was entered May 28, 2021. A.101 (DDE182). Timely Notice of Appeal was filed June 8, 2021. A.1.

## STATEMENT OF ISSUES WITH PLACE RAISED AND RULED ON

1.    Did the District Court err by denying Appellant's new trial motion or request for evidentiary hearing?

> Raised and Ruled on: A.98 (DDE139)(raised); A.16 (Order); A.18-A.22 (oral opinion).

2.    Did the District Court err by precluding the admission of statements made by the alleged victim regarding how, where and by whom he was struck?

> Raised and Ruled on: A.95 (DDE92); A.2-9.

3.    Did the District Court err by its confusing specific unanimity jury instruction?

> Raised and Ruled on: A.10-15.

4.    Did the District Court err in its guideline calculation?

> Raised and Ruled on: A.28-40; A.101 (DDE172).

5.      Did the District Court err interpreting certain sentencing guidelines and by imposing an unreasonable 28-month sentence?

<u>Raised and Ruled on</u>: A.101 (DDE172); A.28-77.

## **RELATED CASES**

None.

## **STATEMENT OF THE CASE**

<u>Relevant Facts</u>

Appellant was the Bordentown Township NJ Police ("BTPD") Chief and Township Business Administrator, and well served the community. (Notes of Testimony "NT" 631-632).[1]

Beginning at least September 11, 2015, BTPD Officer Nathan Roohr surreptitiously recorded Appellant and others. Roohr was disgruntled by Appellant's disciplinarian management style, and Appellant's handling of personnel, policy and salary positions which affected Roohr and others financially and otherwise. Roohr and other officers expressed that until BTPD Captain Brian Pesce - who indeed replaced Appellant - would become

---

[1] Not all referenced transcript portions are included in the Appendix if referenced for factual background and not necessary for understanding the issues presented. LAR 30.3. Sufficiency of the evidence is not challenged. If an "NT" cite (used for transcripts not in the Appendix) is not preceded by a date, the reference is to the sequentially numbered <u>trial</u> transcript. NT references to transcripts of hearings are preceded by a date to avoid confusion over duplicate page numbers to trial transcripts.

Chief, Appellant's unpopular management style and fiscally tight policies would continue. (NT709:8-16; 799-800; 925:1-17; 974-1003).

On September 1, 2016, BTPD received a call from Ramada Inn staff. Police Officers (PO) Shawn Mount and Salvatore Guido responded. The hotel manager advised that a black male Timothy Stroye ("Stroye") and a female Tanya Merritt ("Merritt") secured a room without payment. (NT610:25-613:5). The officers approached the pair. Merritt ignored their request for identification and went to the second floor. The officers followed, commanding Stroye to remain on the first floor. Stroye defied the commands. Merritt resisted PO Mount's attempt to restrain her, striking Mount. (NT614-618). When PO Guido assisted, Stroye intervened, ignoring continuing commands to desist. Stroye attacked PO Guido. When PO Mount advised Stroye he was being arrested, Stroye violently attacked Mount. Stroye threw the bigger and taller Mount against a wall. (NT618-621). Stroye remained undaunted by Mount's use of physical force and pepper spray. Stroye covered his face with a towel, shoved the sprayed towel to Mount's face, and continued punching Mount. Mount - a police officer for 16 years - was so badly beaten by Stroye that for the first time ever, Mount thought about using deadly force. Mount suffered excruciating pain, bruised kidney, and other serious injuries. An ambulance took Mount to the hospital. Mount

was out of work for three weeks. (NT623, 632-641).

While Stroye was attacking Mount, Merritt was attacking PO Guido. (NT1266). Other officers, including Appellant, arrived. Appellant verbally handled onlooker control. Stroye struggled with other officers including Roohr, and eventually was handcuffed. (NT686-693).

Appellant stayed by Mount's side, insisting Mount go to the hospital. (NT647-648). Stroye was being walked by PO Guido through a doorway on the Ramada's second floor, to a stairway leading to the first floor. Guido linked arms with Stroye. PO Anthony Nagle was in front of Stroye. Stroye stopped walking, yelled angrily, and threated to sue the officers. (NT695:20-24; 801-802). Roohr was behind Guido and Stroye. (NT694:25-696:4). Roohr accompanied Guido and Stroye from the second floor down to the first floor, out a first-floor door and then to the police car. (NT702-705).

Roohr testified Guido gave Stroye a <u>hard push</u> when Stroye stopped walking in the second floor doorway. (NT839:2-23). Guido conversely testified he only gave Stroye a "<u>little nudge</u>". (NT975:15-16 underline added). Roohr said Guido's push was justified to get Stroye - who was passively resisting - to move forward. (NT836:24-838:9). Roohr contended that Appellant also pushed Stroye - simultaneously to Guido pushing Stroye - causing Stroye's head to strike the metal door jamb of the second-floor

doorway. Roohr said the contact made a "loud thud". (NT697:17-698:5). No other police officers - who were proximate enough to hear - heard any loud thud. (NT863-865; 1014-1015; 1164:9-13); (D-179[2], recording with PO Simmons, A.325-329). Of 40-50 witnesses the FBI interviewed, Roohr was the only one who allegedly heard it. (NT1601:16-21).

Throughout his trial and grand jury testimony, prior writings, and recordings, Roohr made numerous inconsistent statements concerning Appellant's alleged push of Stroye. Those inconsistent statements, among many others[3], regarded the nature of the alleged push by Appellant (NT807); which hand Appellant used to push (NT830-836); and when Appellant pushed (simultaneous to vs. after Guido's hard push)(NT804-806).

None of the other 40-50 interviewed witnesses saw Appellant touch Stroye. (NT1597). PO Nagle testified he did not see any push by Appellant. (NT1166:9-1167:4). In recorded conversations, each of PO Simmons and PO

---

[2] Recordings are not included in the Appendix. Instead, for ease of review the corresponding transcript is included, as the content of the transcripts was not materially disputed at trial.

[3] Cross-examination of Roohr revealed many more inconsistencies, but for brevity only some are described.

Mount said he did not see Appellant touch Stroye.[4]  Appellant stayed on the second floor with Mount until Mount was taken by ambulance (which was after Stroye already was removed from the Ramada). (NT647:17-648:23). Only PO Guido, in wildly vacillating, often inconsistent testimony, said he saw some semblance of a push by Appellant. Guido changed his story too many times to recount. Ultimately Guido testified he had no independent recollection of seeing Appellant push Stroye. (NT1419:19-1420:9; 1431:12-24).

Although Roohr was a trained police officer aware of evidence preservation, Roohr deleted at least 20 recordings. He did so knowing it would deprive the FBI, prosecutors, Appellant, and ultimately a jury, of the opportunity to evaluate any exculpatory value of those deleted recordings. Neither the FBI nor the prosecutors sought to recover the deleted recordings. (NT1050-1067; 1534-1541).

Whenever in recordings Roohr alleged Appellant struck Stroye, Appellant denied such and/or stated he thought Roohr had said <u>Roohr</u> struck Stroye.[5] On recording GE154, PO Mount was present. A.330-355.

---

[4] A.325-329 (D-179-T, Simmons); A.330-355 (GE154-T, Mount).

[5] *See e.g.* A.356-360 (GE131-T) A.330-355 (GE154-T); NT1568:23-1569:8.

Mount testified that during the conversation, Appellant's reaction was genuine surprise when Roohr stated Appellant pushed Stroye. Mount knew Appellant's demeanor well, based on years of observation. (NT666:24-669:4).

Rather than taking concerns regarding Appellant's alleged push of Stroye through the proper chain of the Burlington County Prosecutor or the NJ Attorney General's Office, Roohr went to his friend FBI agent Jacob Archer. Archer was a long-time rival of Appellant with his own axe to grind. Before he became an FBI agent, Archer was a political rival of Appellant; tried to have Appellant investigated based on frivolous allegations; and disliked Appellant. Archer pulled FBI Agent Arthur Durrant into the investigation. Archer already knew Durrant because about a decade earlier, before Archer joined the FBI, Archer attempted to have Appellant investigated by the FBI based on unfounded accusations. Durrant was the agent who investigated the prior unfounded allegations made by Archer. In intervening years, Archer kept in touch with Durrant, and sought to have Durrant investigate Appellant for other unfounded allegations.[6]

On December 22, 2016, FBI agents conducted a surreptitiously

---

[6] NT1038-1044;1526-1531; 12-11-2018 NT94-101; 109-119; 131; 155-166, motions hearing.

recorded meeting with Appellant about the Ramada events. Appellant had no prior notice of the interview. (NT1568). Appellant voluntarily spoke with them. For about an hour, Appellant answered all questions. (NT1563-1565). Appellant's answers were consistent with what witnesses Nagle and Mount stated in FBI supervised recordings Roohr made during the investigation. (NT1569). Appellant made no efforts to destroy or conceal information. (NT1566:24-1567:13; 1570:6-8; 1583:6-10). Appellant volunteered to have Captain (now Chief) Pesce supply agents with any materials agents wanted, without intervention by Appellant. (NT1586-1587). Appellant said in the interview, in substance, he never touched Stroye. A.211-215 (GE134-T)[7].

The FBI interviewed Stroye. Stroye's version of the Ramada events was very different than that testified to by Roohr and Guido, importantly regarding the description of who struck Stroye and where such occurred. Stroye's statements demonstrate it could not have been Appellant who struck Stroye. The details of Stroye's statements are discussed *infra* Argument Section II in context of improper evidentiary limitations imposed on Appellant's counsel's questioning regarding such.

Once the jury was dismissed, four jurors contacted Appellant's trial

---

[7] The government provided this partial transcript to the jury as an aid.

counsel and provided affidavits regarding biases and bad conduct of other jurors. They also revealed that a juror brought some of those issues to the attention of the District Court during deliberations, of which the parties were not advised. The details are discussed in context *infra* Argument Section I.

Procedural History and Rulings Presented for Review

Indictment Count One charged that on September 1, 2016 Appellant assaulted Stroye because of Stroye's race and color, violating 18 U.S.C. § 249 (a)(1).  Count Two charged that on September 1, 2016, Appellant, acting under color of law, assaulted Stroye, violating 18 U.S.C. § 242. Count Three charged that on December 22, 2016, Appellant made false statements to the FBI, violating 18 U.S.C. § 1001(a)(2). A.108-117.

A hearing on Appellant's pretrial motions occurred December 11, 2018. A.91 (DDE47). A decisional Order was signed December 12, 2018. A.91 (DDE46)(not appealed). The parties made additional motions which were decided by Order dated September 6, 2019. A.92 (DDE58, 60-62, 64)(not appealed).

Jury trial occurred September 16, 2019 through October 11, 2019. After prior indications of deadlock on all counts, and several instructions from the Court to continue deliberating, on October 9, 2019 the jury

returned a guilty verdict on Count 3. A.92-95 (DDE65-98). Mistrial was declared October 11, 2019 regarding Counts 1 and 2: the jury remained deadlocked. A.96 (DDE103). On November 14, 2019, the District Court severed Count 3 for sentencing. A.98 (DDE137).

Appellant filed a motion to vacate his conviction, requesting an evidentiary hearing. A.98 (DDE139). Oral argument was held January 29, 2020. A.98 (DDE144). The District Court denied the motion without evidentiary hearing. A.16 (Order); A.18-22 (oral opinion).

Appellant was sentenced May 26, 2021. Appellant challenged the PSR and Court's guideline calculations. The Court upward varied to impose a 28-month sentence. A.23-85; Statement of Reasons.

Other in-trial evidentiary rulings presented for review are referenced *supra* (Statement of Issues), and the factual context is presented in the Argument sections below.

Retrial on Counts 1 and 2 took place November through December 2021. The second jury also was deadlocked on both counts. Mistrial was declared December 1, 2021. A.104-105 (DDE215). On December 20, 2021, on government request, the District Court dismissed Counts 1 and 2. A.106 (DDE243).

## <u>SUMMARY OF ARGUMENT</u>

**I.**

1. The District Court erred by denying appellant's new trial motion and evidentiary hearing request. Several jurors demonstrated improper bias, and engaged in improper conduct. Juror affidavits support that specific, nonspeculative improprieties occurred. Certain jurors forced their biases upon other jurors. One juror discussed in deliberations racial discrimination she experienced as a child; racially discriminatory experiences suffered by her sons; and the race of other jurors, all of which demonstrate her biases. She also during the evidence phase expressed her opinion of guilt and that she hopes all others did so too, constituting premature deliberations. The affidavits express that some jurors improperly pressured other jurors to vote guilty. One juror also consulted outside definitions of terms used in the jury instructions and brought that research to the other jurors.

The bias, improprieties, and premature deliberation comments deprived Appellant of his constitutional right to a fair and impartial jury. The Court should vacate Appellant's conviction and remand for a new trial. Alternatively, if the Court determines that the record does not establish such beyond a *prima facie* case, the Court should vacate the District Court's

denial of Appellant's new trial motion, and remand for an evidentiary hearing.

2. A juror made material misrepresentations in *voir dire*. Appellant's conviction should be vacated. Alternatively, the matter should be remanded to the District Court for an evidentiary hearing. Juror affidavits reflect that in discussions with other jurors during trial - and particularly during deliberations - the offending juror displayed biases, including stating she has an anti-police bias, which the juror concealed during *voir dire*. That evidence is corroborated by the offending juror's post-trial interview with the Philadelphia Inquirer, which article was submitted with Appellant's motion. In *voir dire* the juror answered numerous material questions dishonestly. Truthful responses would have provided basis for a cause and peremptory challenge. The offending juror also improperly was influenced in her decision by worry for her own sons' reaction and community reaction to a not guilty verdict, and attempted to have other jurors also be improperly concerned about the latter. Because of the juror's dishonestly hidden biases and concerns during *voir dire*, Appellant was deprived of his Sixth Amendment right to a fair and impartial jury. During the trial the District Court was made aware of - but did not bring to the parties' attention - juror complaints, depriving Appellant of the opportunity to address the issue

then.

**II.**     The District Court gave a confusing specific unanimity instruction regarding Count 3, particularly regarding finding which (if any) statements Appellant made, of several allegedly false statements charged. This substantial error violated Appellant's Sixth Amendment right to a unanimous jury. It is not harmless error beyond a reasonable doubt. Appellant's conviction should be reversed.

**III.**     The District Court erred in its guideline calculation. The District Court incorrectly applied a cross-reference to U.S.S.G. §2H1.1, pursuant to U.S.S.G. §2B1.1(c)(3)(B). The cross-reference was error because Appellant's false statement conviction does not establish another offense, as required by §2B1.1(c)(3)(B) for the cross-reference to apply. Further, that subsection only applies to fraudulent conduct covered by another guideline, not to non-fraudulent conduct such as assault (which was the alleged conduct based on which the District Court applied U.S.S.G. §2H1.1). The District Court erred by applying §2H1.1. The sentence should be vacated, and the matter remanded for resentencing.

**IV.**     The District Court's sentence was unreasonable, and the Court incorrectly interpreted guideline policy statements. The District Court imposed a 28-month sentence as an upward variance pursuant to 18 U.S.C.

§ 3553, from the 10-16 month guideline range it found applicable. Appellant contended that a 0-6 month guideline range applied. The imposed sentence is unreasonably excessive and greater than necessary. The District Court erroneously relied on several inapplicable grounds for the upward variance. The Court erroneously interpreted policy statement U.S.S.G. §5K2.9 to apply. Also, the District Court abused its discretion regarding application of U.S.S.G. §5K2.9.  The District Court also erroneously considered policy statement U.S.S.G. §5K2.7 as applicable to its upward variance analysis.

Finally, the other factors for consideration under 18 U.S.C. § 3553 make clear that the 28-month sentence is unreasonable and greater than necessary. The Court should vacate Appellant's sentence and remand for resentencing.

## **ARGUMENT**

## I.   **The District Court Erred by Denying Appellant's New Trial Motion and by Denying an Evidentiary Hearing**

Standard or Scope of Review. Abuse of discretion. *U.S. v. Noel*, 905 F.3d 258, 266-267 (3d Cir. 2018). Also, the "presence of a biased juror is a structural error not subject to a harmless error analysis." *Cunningham v. Shoop*, 11-3005 at *9 (6th Cir. Jan. 10, 2022**)**. *See also U.S. v. French*, 904 F.3d 111 (1st Cir. 2018**)**.

## Discussion

Appellant's post-verdict motion supporting documents establish juror bias, juror false testimony during *voir dire*, and other juror misconduct, which require vacatur of Appellant's conviction, or alternatively an evidentiary hearing.

1. **Several Jurors Demonstrated Improper Bias and Engaged in Improper Conduct**

The juror affidavits prove that "'specific, nonspeculative impropriety has occurred.'" *Noel*, 905 F.3d at 273. Evidence of juror misconduct need not be incontrovertible or irrebuttable, and the standard can be met in a variety of ways, including (as here) "juror affidavits 'alleging specific acts of inappropriate conduct'". *Noel*, 905 F.3d at 274-275. A new trial is warranted.

As detailed below, juror Pamela Richardson was biased. Richardson forced her bias upon other jurors. Richardson discussed with jurors racial discrimination she experienced as a child; racial discrimination suffered by her sons; the race of other jurors; and her anti-police bias. The affidavits also establish that some jurors exerted improper pressure on others to vote guilty solely to avoid themselves being labelled racist. In addition, one juror consulted outside definitions of terms used in the jury instructions and

brought his outside research to the others.

Juror Kelly Cunningham called Appellant's trial counsel's office promptly after the jury was discharged. A.165-166 (Cunningham Affidavit, "CA", ¶¶2-4). Cunningham had written a note to the Court (now under seal) just before the final hung jury note was sent, because she was so "distraught by the comments … and the demeanor of certain Jurors…." A.167 (CA¶7).

Cunningham stated "bullying, racial tension and unfounded accusations" influenced deliberations. A.166-167 (CA¶5). Cunningham's affidavit stated that the conduct and comments by other jurors pressured her to vote guilty so she would not be labeled racist, not because she thought the government proved its case. A.167, 173 (CA¶¶6, 23). Affiant juror Marc Cianfrani stated the same regarding his vote. A.207-208 (Cianfrani Affidavit, "MCA", ¶19).

Similarly, affiant juror Jillian Neiman stated her guilty vote "was not a product of [her] true thoughts about the evidence. [She] felt pressured into the guilty verdict even though … [she] believed the government did not prove the case. Even when I voted guilty[,] I did not believe that Mr. Nucera was guilty." When Neiman tried to focus the jury's attention on the evidence, she was "shut down" by Richardson and juror Esther Addo, and other jurors were "nasty" to her when she tried to do so. A.180-181 (Neiman

Affidavit, "NA", ¶4). Neiman only voted guilty because, like Cunningham, she was infected by the improper biases, external information, and pressure put forth by Richardson and others. Neiman recounted a comment by juror Kia Lipscomb asking Neiman how she would feel if Nucera spoke to Neiman that way [meaning using racially derogatory terms]. That comment along with the others made Neiman "feel like [she] was being racist to vote not guilty, even though not guilty was [her] true belief from the evidence." A.184-185 (NA¶13).

Affiant Cianfrani noted statements made by jurors Lipscomb and Addo which equated not guilty verdicts with condoning and empowering continued abuse by police against black men. A.209 (MCA¶22). The impact made by the comments of other jurors such as Richardson, Lipscomb and Addo was compounded by the District Court's repeated push for a verdict despite pronouncements in notes from the jurors they were deadlocked. A.180-181 (NA¶4); A.174-175 (CA¶25).

The affidavits demonstrate a *prima facie* case of bias and improper conduct by Richardson and other jurors. The affidavits also aver Richardson told the other jurors about discrimination she suffered, such as when traveling in the South during her youth she had to relieve herself in jars roadside because of segregation, and to leave places because of her skin

color. Those stories understandably and predictably evoked emotional reaction by jurors, including tears. A.175-176 (CA¶¶26-28); A.183 (NA¶9); A.203, 205-206 (MCA¶7, 8, 13); A.197 (Affidavit of juror Donna Viscome, "VA", ¶22). In a post-trial Philadelphia Inquirer interview, Richardson corroborated that she "spoke to the panel about her own experience as an African American woman, including her life in the South" and also corroborated that "'All the men [on the jury] who thought that he was guilty were crying.'" A.164.

During deliberations Richardson made a comment regarding shooting certain jurors (who were white) because they denied being racist, purported to understand what she had gone through as a black person, or because they were voting not guilty. A.176 (CA¶29); A.184 (NA¶10); A.197-198 (VA¶23); A.204-205, 208 (MCA¶¶9, 12, 20). The affidavits recount how some jurors expressed the impact of Richardson's extraneous stories. Juror Paul Macluskie stated to Richardson "I'm sorry, I'm so sorry, I remember those days", and embraced Richardson. A.175 (CA¶27); A.184 (NA¶11). Juror Shawn Poinsett similarly embraced Richardson. A.175-176 (CA¶28); A.206-207 (MCA¶¶14, 15, 18). Macluskie also stated he needed to make reparations for the treatment of African Americans and for his own bad behavior in his youth. Macluskie made a tearful speech that if they did not convict

Appellant, "these things will continue to happen." A.206-207 (MCA¶¶15, 17). *See also* A.177 (CA¶33).

Richardson's bias further is corroborated by additional facts in the affidavits and other parts of the record, including:

- Richardson demonstrated apathy to review the evidence. Cunningham did not see Richardson review any evidence on the iPad the Court provided for such purpose, despite other jurors asking her to do so to consider alternative points of view. Richardson told other jurors the only thing she wrote in her juror notebook was a list of states to which she traveled or planned to travel, A.168-169 (CA¶¶11, 12), and also stated "all I am doing is making entries in my notebook about you SOB's". A.196 (VA¶21).

- Richardson yelled at juror Viscome "you don't know what its [sic] like to be a black person". A.190 (VA¶6); A.203 (MCA¶5).

- Richardson accused other jurors of improper racial bias in favor of Appellant, alleging they would only be happy with an all-white jury. A.167, 169-172 (CA¶¶6, 14, 15, 16, 21); A.192-193 (VA¶12); A.203 (MCA at ¶6).

- When affiant Cianfrani stated to Richardson that she and other jurors voting for conviction may be looking at things through a

"different lens", Richardson responded, "No shit, Sherlock, we're black". A.202 (MCA¶3). Richardson corroborated this attribution in her Inquirer interview, recounting her "No shit, Sherlock" comment. A.163.

- Richardson told the other jurors she "has a problem with cops" (discussed further *infra*). A.202 (MCA¶4).

- Richardson told other jurors her sons were discriminated against by police because of her sons' race and that she had to warn her sons how to interact with police. A.171, CA¶¶18, 19, 30; A.182-183, NA¶¶7,8,9; A.190-191 VA¶¶7, 8, 9; A.204-205, MCA¶¶10, 11, 12.

- Richardson stated "I'm retired, this is $50 more per day than I am making at home, I have all the time in the world." A.191-192 (VA¶10). Other affiant jurors had similar recollections of Richardson making it clear she had plenty of time to wait for the guilty result she wanted, specifically referencing her status as a retiree (thus exerting pressure on those jurors who had jobs and other obligations to which they needed to return). A.173 (CA¶22); A.181 (NA¶5); A.189-190 (VA¶5).

During the <u>evidence phase</u> of trial, Richardson prematurely expressed

to other jurors "Hope you are all thinking guilty, I can be here all day, I have f_ ___king nowhere to be." Later, in deliberations, juror Poinsette even referenced Richardson's premature comment, stating "It doesn't matter anyway, we all have to vote the way Pam [Richardson…] votes". A.189-190 (VA¶5). Richardson's comments constitute premature deliberations, which of course violated the District Court's repeated instructions not to discuss the case until deliberations. (*See e.g.* NT 392; 573). The comments also demonstrate Richardson's bias: she formed her opinion prematurely before hearing/seeing all evidence. This fact is corroborated by the statements referenced above that (1) she only took notes about her past and future travel, and about the other jurors, not about the evidence, and (2) she refused to review the evidence during deliberations to consider alternative viewpoints.

This Court has recognized that

> Once a juror [prematurely] expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion. Consequently, the mere act of openly expressing his or her views may tend to cause the juror to approach the case with less than a fully open mind and to adhere to the publicly expressed viewpoint.

*U.S. v. Resko*, 3 F.3d 684, 689 (3d Cir. 1993). "A trial court must presume

juror bias when the court discovers evidence of juror misconduct, such as premature deliberations." *U.S. v. Hernandez-Bourdier*, 19-3738, at *5 (3d Cir. 2021)(not precedential).

Affiant Viscome twice during deliberations attempted to bring concerns about the improprieties to the District Court's attention. She advised the Deputy Clerk that some jurors were calling other jurors racist, and that she was concerned with "disrespect and racial comments" in the jury room. The Clerk advised Viscome to write the Judge a note if she "had any further issues." A.194-195 (VA¶16). It is unclear if the Judge was made aware by the Clerk at that point. Viscome did not want the foreperson to read any note to the Judge: she was not provided with any manner of follow up to contact the Court privately without other jurors or the spokesperson knowing. A.194-195 (VA¶16). Viscome already had attempted to bring the issues to the District Court's attention.

The second time Viscome expressed her concerns to the Clerk, the Judge addressed the jurors. Viscome started crying and "told the Judge that there was serious disrespect going on in the jury room". She may have also said there were threats being made, but she was not certain she stated the latter. The Judge advised the jurors to leave personal feelings aside and ordered the jurors to decide whether they were going to continue. A.198-199

(VA¶24-25). It appears the District Court did not ask any questions to investigate the nature of the concerns of juror Viscome. There was no inquiry by the Court into what already tainted deliberations. The Court did not advise counsel for the parties of either interaction.

The jurors' ability to bring issues of bias and juror misconduct to the trial court's attention is one of the intended safeguards of a defendant's Sixth Amendment right to an impartial jury. "As a trial proceeds, the court, counsel, and court personnel have some opportunity to learn of any juror misconduct. And, before the verdict, jurors themselves can report misconduct to the court." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 866 (2017). However, when that ability is hindered - such as it was here when Viscome's twice expressed concern was not investigated properly, and the parties were not notified - that protection is frustrated.

The biases expressed by Richardson, and by jurors Lipscomb, Addo and Macluskie (at least its impact on him), as well as the District Court's only cursory address of the brewing issues in deliberations, clearly impacted the verdict. Cunningham had to retreat to the bathroom to cry during deliberations because she was so upset by comments by Lipscomb and

Richardson. [8] A.193 (VA¶14); A.172-173 (CA¶21). Viscome and others

believed the Court would not accept deadlock: "There was a clear consensus

that we had to reach at least one unanimous verdict based on the Court's

instructions, including after we indicated previously that we were

deadlocked on all counts." A.195 (VA¶17). *See also* A.185 (NA¶14). That fact,

in combination with Richardson adamantly insisting on a guilty verdict and

the pressure some jurors exerted on others to vote guilty or be labelled

racist, gave jurors had a shared understanding that their only way out of the

jury room was conviction on at least one count. At a minimum each of jurors

Viscome, Cunningham, Neiman and Cianfrani changed their vote regarding

Count 3 based on the foregoing, and immediately were regretful.[9] An

evidentiary hearing could have revealed that others did so as well, infected

by the juror biases and the other factors discussed *infra*. At a minimum, the

District Court erred by denying an evidentiary hearing at which the *prima*

*facie* allegations of bias and improper conduct further could have been

---

[8] Cunningham has Kinship Legal Guardianship of a black child, so the comment was particularly disconcerting to her. A.165-166 (CA¶3); A.193-194 (VA ¶15).

[9] A.195-196 (VA ¶¶18, 19, 20); A.173-175, 177 (CA¶23, 24, 25, 32); A.180-181 (NA¶4); A.207-209 (MCA¶¶19, 20, 22).

explored.

Additionally, all four affiant jurors affirmed that other juror misconduct occurred. Juror Macluskie looked up definitions of "unreasonable" and "unnecessary" on his own and supplied the definitions to the others, who were debating those definitions.[10] McCluskie violated the District Court's instructions (NT1691; 1726) not to consult outside materials. Although those instructions did not relate to Count 3, the conduct further demonstrates that improprieties occurred.

The biases of several jurors, as well as other jury misconduct, are demonstrated. The Court should vacate Appellant's conviction and remand for a new trial.

Alternatively, if this Court determines the record does not establish such beyond a *prima facie* case, the Court should vacate the District Court's denial of Appellant's new trial motion, and remand for an evidentiary hearing. The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982) (bold added). It was incumbent on "the trial judge to 'determine the circumstances, the

---

[10] A.177-178 (CA¶34); A.186 (NA¶16); A.200 (VA ¶27); A.210 (MCA¶23).

impact thereof upon the juror, and whether or not [they were] prejudicial, in a *hearing* with all interested parties permitted to participate.' *Id.* [*Remmer v. U.S.*, 347 U.S. 227 (1954)], at 230 (emphasis added)." *Phillips*, 455 U.S. 209, 216 (1982). The Sixth Circuit recently noted that "*Phillips*...reaffirmed *Remmer*'s core holding that a showing of juror bias demands a hearing.... Subsequent Supreme Court decisions that address *Remmer* hearings confirm as much...." *Shoop*, 11-3005 at *9 (6th Cir. Jan. 10, 2022).

The threshold proof required for a hearing is merely a *prima-facie* showing of bias: that is, credible allegations of bias. The affidavits presented meet that threshold. *Shoop*, 11-3005 at *11. Proof of bias is not limited to actual bias: bias also may be implied bias. *Shoop*, 11-3005 at *9.

### 2. Juror Richardson Made Misrepresentations and Concealed Biases During Voir Dire

Juror Richardson made material misrepresentations in *voir dire*, concealing her biases. Truthful *voir dire* answers are necessary: admitted bias can result in cause challenges or peremptory challenges. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).

Richardson completed a written questionnaire and individual oral *voir dire* designed to uncover biases, including against police. Richardson concealed biases of which she was well-aware. The *prima facie* evidence of

such presented with Appellant's post-verdict motion at minimum warranted an evidentiary hearing.

As the affidavits and Inquirer interview demonstrate, Richardson displayed her biases in her discussions with other jurors during the evidence phase of trial and during deliberations. Richardson presented to other jurors her belief that police regularly mistreat black men. She advised the other jurors that as a mother of black sons she gave special warnings to her sons about police misconduct. Presentation of her biases and experiences to the other jurors eroded the fairness of deliberations. Richardson doubled down and presented specific anecdotes about police harassing her sons based on her sons' race. She told jurors police stopped her sons for "driving while black" (A.171, CA¶18; A.205, MCA¶11), and that one son was harassed by police merely because he was a black man working in their yard. A.171 (CA¶8; A.182, NA¶7; A.191, VA¶9; A.205, MCA¶12).

Egregiously, during *voir dire* Richardson hid what she later told other jurors during trial: that she had "a problem with cops". She falsely claimed to the others that during *voir dire* she admitted her "problem with cops". A.202 (MCA¶3,4). The opposite was true: Richardson told the Court and parties she did not have any such bias, and that her sons' interactions with

police would not affect her impartiality. In Richardson's questionnaire, she provided dishonest and deceptive responses. Some examples are:

1.    Richardson replied "No" to **<u>Question 25</u>**, which asked whether she had "any ... beliefs that would make ... [her] unable to render a verdict for reasons unrelated to the law or evidence?" A.123. Richardson's beliefs regarding police treatment of black males, including her sons, and her "problem with cops", should have produced a positive response to Question 25. That conclusion is supported by Richardson's behavior during trial and deliberations; by her statements to the Inquirer; and by a September 17, 2014 Facebook post Richardson made displaying bias against police. Richardson's post stated "Now that professional athletes are losing money and jobs due to their poor behavior against children and women, when are correctional officers and policemen going to be sanctioned?" A.157-159. The post provides additional *prima facie* evidence of Richardson's anti-police bias and her assumptions that police are prone to violence. The post's date demonstrates Richardson harbored that bias for at least five years prior to Appellant's trial. Her belief that police mistreat people of color and her anti-police bias is clear.

2.    Richardson expressed to fellow jurors, but not in *voir dire*, that "she would be hard-pressed to return to her sons and her community

without a conviction or jail time for Frank Nucera." A.172 (CA¶20).

Richardson concealed that public pressure concern in her response to

Question 25 (above), and to **Question 42**, which asked, "… Do you believe

that what you heard/read/saw in [other] … cases/matters [in the media]

may impact the way you view evidence in this case? Response: No." A.127.

Richardson's response was untruthful, considering her prior Facebook

post; her statement to other jurors that she had a "problem with cops"; her

perception of police interactions with black men and her need to warn her

sons; her perception of her sons' experiences; and her worry about her

family's and community reaction if there was a not guilty verdict.

    3.    Richardson told jurors her sons were targeted by police because

of their race, including for "driving while black." That term presupposes

racial profiling by police. She also told the other jurors one son was

harassed by police merely because he was a black man working in their

yard. Despite her view of those experiences and police, Richardson

answered **Question 61** like this:

> 61. Have you or any relative or close friend ever been
> charged with any crime or been the subject of **any
> investigation**?
>
> Response: Yes.
>
> If YES,

> a. Would that experience affect your ability to be fair and impartial in this case?  Response: No.
>
> b. Would it otherwise make it difficult for you to sit as a juror in this case?  Response: No.

A.134 (bold added). It is evident from the affidavits that police interactions with her sons (which were **investigations**, into which the question inquired) tainted her view of police officers, and that her sons' experiences affected her "ability to be fair and impartial" and made it "difficult for [her] to sit as a juror …." Richardson's responses to Question 61a & 61b were untrue.

4.    In other responses Richardson continued to deny bias and strong opinions regarding race, negative experiences concerning race, her sons' experiences, and any hesitation to acquit if the government did not prove its case:

> 70. Do you know of any reason why you may be prejudiced for or against the government, for or against any witness, or for or against the defendant, because of the nature of the charges or otherwise?
>
> Response: No.
>
> 71. Have you or anyone close to you ever had a serious negative experience with a person of another race or ethnicity?
>
> Response: No.
>
> 73. Have you or anyone close to you ever accused anyone of racial or ethnic discrimination?

Response: No.

74. Have you or anyone close to you ever been the victim of discrimination?

Response: No.

...

77. Would you have any difficulty serving as a completely impartial juror on a case in which a white police chief is accused of using unnecessary force against a black man during the arrest of the black man?

Response: No.

...

86. It is not a crime for police officers to use language that involves racial slurs/derogatory names or profanity. Do you believe that it should be a crime for police officers to use language that involves racial slurs/derogatory names or profanity?

Response: No.

87. Would you have difficulty being a completely impartial juror on a trial that involves rough language or profanity?

Response: No.

88. Would you have any difficulty being a completely impartial juror in a trial that involves words used by the person charged that are racially derogatory, such as the "N word," or other racially derogatory words?

Response: No.

89. Do you believe that if someone uses racially charged derogatory words verbally, that such person would be inclined to act with physical aggression as well?

Response: Yes.

Please explain your thoughts in that regard:

Response: when a person can't contain themselves from using derogatory words it can lead to physical aggression.[11]

90. Do you have any strong opinions about allegations against police officers accused of engaging in racially motivated abuse of or violence against minorities?

Response: No.

...

101. If the government does not prove its case beyond a reasonable doubt, would you hesitate to return a verdict of not guilty because he was a police chief?

Response: No.

102. Do you know of any reason why you may feel bias for or against the government, for or against any witness, or for or against Frank Nucera, Jr., because of the nature of the charges or otherwise?

Response: No.

A.137-143. Those answers are misleading. Some are outright dishonest.

That is evident from Richardson's actual opinions about police and their

interaction with minorities, and her personal and family experiences

regarding racism and discrimination, which only later were revealed by

---

[11] Although Richardson there did say "can", in her statement to the Inquirer she stated that she would "automatically have to assume" that the use of racist language meant "he would do something to somebody."

Richardson to the other jurors and in the Inquirer interview. Richardson's recounting to jurors how she experienced segregation in her youth was recounting discrimination she experienced, despite her denial in the responses to Question 74 that she ever was a victim of discrimination.

Some of Richardson's written responses caused the District Court and counsel to inquire during oral *voir dire* to determine if she could be an unbiased juror. However, Richardson again gave deceptive responses. For example, the Court inquired:

> COURT:    Okay. Question 89....
>
> 89: Do you believe that if someone uses racially charged derogatory words verbally, that such person would be inclined to act with physical aggression as well.  Yes, when a person can't contain themselves from using derogatory words in a professional setting, it can, and you underline can, lead to physical aggression. Correct?
>
> Richardson: Correct.
>
> Court:       Okay. In this case the jurors are going to hear testimony that the defendant Mr. Nucera used racial epithets included the N-word. There's also allegations in the case, among the allegations, among the crimes alleged, and it's just allegations, he's entitled to the presumption of innocence, that Mr. Nucera during, he was a police chief, police officer, during the course of an arrest of a young African American male, he allegedly used excessive force and the reason was a racial motivation, he was racially motivated to use excessive force.

Now the reason for that question and the reason for my questions is I want to make sure you're able to separate these two concepts, the use of the language, the racial epithets, that in and of itself is not a crime.

Richardson:    Correct.

Court:    Anyone as awful as it is, can say things. But there are allegations of crimes here, the excessive force, racial motivation. I want to make sure you understand that. Let's assume you're a juror and let's assume he did in fact use those words, I want to make sure you understand that that does not make him guilty by itself of the physical force charged. Do you understand that?

Richardson:    Correct.

Court:    Do you have any difficulty understanding that?

Richardson:    No.

Court:    Do you have any difficulty separating those two concepts in your mind?

Richardson:    No.

A.149-150.

Counsel for Appellant also questioned Richardson about her response to Question 89:

Mr. Cipparone: Good morning. With respect to question 89 …**[M]y question really is Mr. Nucera, as with anyone charged with any crime, is presumed innocent, and we have to ensure that the jurors can really embrace that. If you heard evidence he used the N-word and he used it on different occasions at different times, would that lead you to at**

**least, even ever so slightly, have some checkmark against him about whether he would act in a certain way, for example, in a manner aggressively toward an African American, which he is accused of?**

A JUROR [Richardson]: **No, I think now days [sic] hearing the N-word and other derogatory terms is very common.** You know, you hear it in the radio station my son listens to, the music he listens to. Luckily he has a station designed for me when I get in his car. But I don't think - and this was probably the most difficult question I had to answer to be truthful. **I don't think – I think some people might act on those derogatory terms and maybe get a little violent. But I think as you move up in a professional level and you've dealt with people from all different walks of life, you tend not to be as violent because you have more, what's the word, more, more that you could potentially lose. I think if you're just like cleaning the streets, you can use any words you want and you probably could potentially become violent. I think as you get up in profession, you look at where you are. Maybe you've been working 20 or 30 years, you think, oh, my pension, my kids, my house, am I willing to put that on the line to become violent, and most people don't.**

A.154-155 (bold added). Those responses are the direct opposite of what Richardson stated to the Inquirer: "'When somebody used the racist commentary that he has used his whole life, and it's on tape, the racist things he said, you just automatically have to **assume** that he would do something to somebody....'." A.162.

Richardson stated in her written questionnaire her sons had been stopped by police. When asked about those incidents, Richardson's responses were the opposite of what she later revealed to other jurors. Four affiant jurors recalled Richardson stating her son(s) were stopped by police for "driving while black." Yet, in *voir dire*, Richardson denied perceiving the situations that way:

> THE COURT: Okay. 93, your sons -
>
> A. Yes.
>
> Q. - how many times have they been pulled over?
>
> A. My oldest on the way home from work got pulled over three times in a basically maybe five-mile period. And my youngest has gotten pulled over maybe two times.
>
> Q. The oldest three times in five miles. Over what period of time?
>
> A. The same night.
>
> Q. Oh, the same night.
>
> A. Yeah, the same night.
>
> Q. Who pulled him over, do you know?
>
> ...
>
> Q. This was different jurisdictions. It wasn't the same cop?
>
> A. No, it wasn't the same cop.
>
> Q. Two different jurisdictions, three different cops.
>
> A. Three different.
>
> Q. How about your youngest?

A. Same jurisdiction, Marlton.

Q. Same time or two different times?

A. Two different times.

Q. And you believe the reason they were pulled over is because of race?

A. Not with my oldest because it was dark and my oldest is very light, so he wouldn't have been able to tell if he was black or white. He probably would have thought he was white. I guess questioning why he was out so late.

Q. And your youngest? Maybe, maybe not?

A. Maybe, maybe not. Maybe because he's a young kid.

Q. Do you believe the police were wrong to do that?

A. **I think with my oldest, I think - who knows what was going on that night, it could have been there was some robberies or something going on and they were, you know, checking people out on the road that late at night.**

**With my youngest** I think they profiled him because he is **a young kid with a flashy sort of car** and I'm not really sure about him.

Q. Okay.

A. **He gets very emotional so I'm not sure I've gotten the real story**.

Q. How old is he?

A. He's now 20.

**Q. Do you hold a grudge against the police because of pulling your sons over like that?**

A. I wouldn't say a grudge. I think I - I have to stand back as a mom and say hopefully I raised my boys to do the right thing. **But we all know our children**

**don't tell us the whole story so I have to sometimes wonder, you know, are they telling me a story that sounds good to mom or is there something else going on**. So I always stand back and just take a breath and, you know, after everything dies down I say, okay, now what part of the story haven't you told.

Q. I'm glad I'm not sitting where you are answering those questions about my kids.

A. I have good boys.

Q. Mine are good, too. But we have our moments, don't we?

A. Yes.

Q. **I just want to make sure that these incidents involving your sons don't somehow affect the way you look at the evidence in this case if you were a juror**. Here we have law enforcement officers are going to be testifying on behalf of the government presenting their case, of course the defendant is a police officer in this case. So I want you to be able to tell me, if you can, again, there's no right or wrong answer, **I just want to know how you feel about this, whether these incidents involving your sons is going to affect the way you look at the evidence in this case?**

A. I don't think it's going to affect me. I think, like I said with my sons, **I have to take the police officers at their word that that's what's going on. And I know that everybody fudges the answer a little bit, like in my sons' situation, as to what they were doing. So I think I can separate the two from what's happening with my boys to what happened in this case.**

Q. Good.

A.150-153 (bold added). Obviously, the incidents involving Richardson's sons loomed large to her. She equated those incidents with racial profiling ("driving while black"), and contrary to her *voir dire* assurances, she could not "separate the two". Richardson also failed to reveal during *voir dire* the alleged incident regarding her son being approached by police and questioned merely (as she told the other jurors) because he was a black man working in their back yard.

For a claim of juror falsehood during *voir* dire, "a party must establish: (1) the 'juror failed to answer honestly a material question on *voir dire;*' and (2) 'that a correct response would have provided a valid basis for a challenge for cause.'" *U.S. v. Claxton*, 766 F.3d 280, 301 (3d Cir. 2014)(citation omitted). *See also Noel*, 905 F.3d at 274 n.9 (3d Cir. 2018). The "presence of a biased juror is a structural error not subject to a harmless error analysis." *Shoop*, 11-3005 at *9 (6th Cir. Jan. 10, 2022*). See also U.S. v. French*, 904 F.3d 111 (1st Cir. 2018).

Appellant met in the District Court, and still now meets, that standard. Richardson's *voir dire* responses viewed individually and, in the aggregate, concealed her material biases and perceptions. Had Richardson answered *voir dire* inquiries honestly, Appellant would have had basis for a cause challenge because of:

- Richardson's past experiences being discriminated against (including during segregation), which in *voir dire* she denied suffering.

- Richardson's bias against police.

- Richardson's assumption - contrary to her *voir dire* answers - that because Appellant used racist language, she would "just automatically have to **assume** he would do something to somebody."

- Richardson's true perceptions about past treatment of her sons and other black males by police.

Even if the District Court denied a cause challenge, Appellant then could have used a peremptory strike[12] had Richardson's answers been truthful.

Richardson's biases were not the only outside influences she improperly brought to deliberations. She was influenced by worry - and attempted to have other jurors be improperly concerned - about what could be community reaction to a not guilty verdict. She also expressed worry about her own sons' reactions. A.172 (CA¶20).

---

[12] Of course *Batson v. Kentucky*, 476 U.S. 79 (1986) and its progeny regarding reverse-*Batson* challenges were considered. Richardson's then unknown as false or misleading *voir dire* answers did not warrant a cause or peremptory challenge, and none was made.

Appellant was deprived of his right to a fair and impartial jury by Richardson's false and misleading answers during *voir dire*. The general disfavor of post-verdict inquiry into deliberations[13] is inapposite here. The District Court did not bring juror Viscome's expressed concerns to the attention of the parties when it learned of such during trial, which deprived Appellant of input into how the matter was addressed.[14] In that circumstance, it would be unfair to deny recourse and thereby penalize Appellant in the balance of finality and resource economy versus his right to a fair and impartial jury. Had the Court advised the parties, further inquiry could have been conducted and Richardson's biases, perceptions, and her *voir dire* deceptive answers could have been uncovered during trial, along with the other juror improprieties.

Given the clarity of the record establishing that Richardson was materially untruthful in *voir dire*, Appellant's conviction should be reversed. Alternatively, the matter should be remanded to the District Court with an instruction to conduct an evidentiary hearing.

---

[13] *Noel*, 905 F.3d at 270 n.7.

[14] The facts surrounding that the District Court did not bring juror contact to the attention of the parties is discussed more fully *supra* Argument Section I.1.

## II.    The District Court Erred by Precluding Admission of Statements Made by Alleged Victim Stroye

Standard or Scope of Review. An abuse of discretion standard applies to the analysis under FED. R. EVID. 807. *U.S. v. Green*, 617 F.3d 233, 239 (3d Cir. 2010); *U.S. v. Moore*, 375 F.3d 259, 262 (3d Cir. 2004).

As to the ruling under Fed. R. Evid. 403, the District Court did not set forth what it considered to be the potential prejudice of the statements. Because "'there is no way to review its discretion.' ... [this Court] may review the record and conduct the obligatory weighing ... [itself]." *U.S. v. Sriyuth*, 98 F.3d 739, 745 n.9 (3d Cir. 1996).

### Discussion

Agents interviewed Stroye. Stroye's statement of events was materially different from that testified to by Roohr and Guido. Stroye's statements make clear Appellant could not have been the one who struck Stroye. Stroye told the interviewing agents on at least two occasions that:

- while he was lying on the [second] floor at the Ramada, a male officer pressed his knee down on Storye's face, and another officer pressed his knee into Stroye's kidney;

- Stroye was pushed into the lobby [1st **floor**] exit door at the Ramada by police;

- A white male police officer with no facial hair and a "military style" short haircut pushed Stroye into the front passenger door of the police vehicle before Stroye was placed in the rear of the vehicle.

A.216-217 (GE J-ST-10). That description of the perpetrator matched Roohr, not Appellant. Appellant did not have a military style haircut and had facial hair (mustache). Agent Addison agreed they are material differences. A.220-223. At the time referred to by Stroye that a knee was placed on his head, by all accounts (see *supra* Statement of Case) Appellant did not participate in subduing Stroye. Also, Appellant remained on the Ramada's **second floor** until Mount left by ambulance, which was after Stroye was taken downstairs and slammed through the **first floor** Ramada door and then into the police car door. On Stroye's description of events, it could not have been Appellant who struck Stroye.

Although the District Court properly allowed cross-examination regarding the FBI's failure to pursue investigative leads, it erroneously precluded Appellant's counsel from (1) identifying Stroye as the witness who made the statements; and (2) from inquiring into the specifics thereof. A.2-9 (ruling); A.219-223 (testimony). The District Court's stated basis under FED. R. EVID. 403 was that the potential for undue prejudice outweighed the

probative value. The District Court never identified the alleged prejudice on which it premised the balancing test ruling under Rule 403, or how any such prejudice substantially outweighed the acknowledged (by allowance of some cross-examination) probative value. It merely concluded the balance in favor of prejudice. A.2-9. This Court owes no deference to the District Court's determination and should engage in its own balancing. *Sriyuth*, 98 F.3d at 745 n.9.

There would have been no unfair prejudice to the government by identification of the details of the statement or the attribution of them to Stroye, and the record supports no finding of prejudice. The government was aware of the statements. There was no surprise. The statements were made by Stroye to the FBI in December 2016 very early in its investigation, and then several times again in proffer interviews with Stroye before both trials. There is no predictable unfair prejudice from the statements, for which proper non-hearsay basis existed (otherwise no balancing test would have been needed under Rule 403[15]).

Just as the substance was not unduly prejudicial, neither was the

---

[15] The District Court's ruling that aspects were admissible demonstrates there was non-hearsay basis.

source of the statements. The fact that <u>Stroye</u> made the statements enhances the materiality of the investigative *faux pas* of the FBI's failure to investigate that someone other than Appellant – particularly including Roohr – was the culprit. Unlike Appellant, Roohr met Stroye's description of the assaulting officer, and Roohr was in the locations at which Stroye said he was struck. The jury should have been permitted to know Stroye made the statements and the details thereof. *Alvarez v. Ercole*, 763 F.3d 223 (2d Cir. 2014)(holding trial court's preclusion of defense cross-examination into investigative report as impermissible hearsay was error and not harmless: defendant should have been permitted to cross-examine detective about report to show police had not pursued known leads). *Cf. U.S. v. Christie*, 624 F.3d 558, 569 (3d Cir. 2010)(upholding District Court's allowance of testimony presented by government regarding out of court statements by other investigative targets as non-hearsay to demonstrate reliability of investigation, "a fact of considerable consequence.").

Despite the ruling's improper limitations, the government unjustly capitalized on them. The government elicited testimony on re-direct examination of agent Addison that the FBI interviewed 40-50 witnesses; that 30 witnesses testified in the grand jury; that extensive physical investigation was conducted; and that no other person or physical evidence

corroborated the alleged errant witness' statement. A.224-228. That inquiry was prejudicially misleading: the prosecution knew alleged victim Stroye - not some mystery errant witness - was the declarant. Appellant's counsel again requested opportunity to identify Stroye as speaker and the details, including because of the government's unfair re-direct examination. The request was denied. A.7-9. The government continued its unfair exploitation of the ruling by its rebuttal closing argument, there actually referring to the unidentified Stroye as a "mystery witness" unworthy of consideration, well knowing the "mystery witness" was no mystery at all: it was Stroye. A.230.

Because Appellant was barred from eliciting who gave the materially differing statements, the government was permitted to create the misimpression there was one random inconsistent witness, out of 40-50 interviewed, whose observations should be given no weight. In fact, Stroye is the one witness who would have no reason to fabricate when, where, or by whom he was hit. He was the one witness present for every portion of the interaction. He was the one witness without any bias. It was his version of events on which an unbiased, thorough investigation should have focused. The fact that the investigating agents so readily disregarded the words of the individual they considered to be the victim, goes to the heart of the defense jury arguments related to failure to investigate, and to bias of government

witnesses.

The statements also should have been admitted under FED. R. EVID. 807. In *U.S. v. Wilson*, 281 F. Appx. 96 (3d Cir. 2008), this Court outlined relevant factors under Rule 807, which include whether: (1) the declarant was known and named; (2) the statement was made under oath; (3) the declarant knew his assertions were subject to cross-examination; (4) the statement was based on personal knowledge; (5) the declarant had motivation to lie; (6) the statement was corroborated; and (7) the declarant was qualified to make the assertion. *Wilson*, 281 F. Appx. at 99.

Analysis of those factors in the instant case warranted admission under Rule 807:

1. The declarant is known.

2. Although the statements were not under oath, they were reliable under Rule 807's residual clause. Stroye made the statements in the comfort of his own home, in the presence of his attorney. He could be held criminally responsible under 18 U.S.C. § 1001 if he lied. At Stroye's interview, agents explained to Stroye and his attorney the interview would focus on events that happened after Stroye was arrested at the Ramada, not the events leading up to it, so Stroye need not worry about making incriminating statements regarding

his assault on PO Mount. The declarant had no motive to lie, especially as to who pushed him, and how and where.

3. Throughout his meetings with agents and prosecutors, Stroye confirmed the same version, and he was of course aware his interviews were in connection with the criminal investigation and prosecution of who pushed him.

4. Stroye had the best personal knowledge of anyone regarding what happened to him September 1, 2016.

5. Stroye had no motive to lie (see also #2 above).

6. There was corroboration by an interview with BTPD Officer Edwards, whose heard from other BTPD officers that Stroye's head was slammed into a police car door jamb. A.324 (J-EA-2, p.2)(exhibit sticker copied for reference, and redacted of information not relevant to issue raised).

7. Stroye was qualified by personal knowledge to make the assertions.

FED. R. EVID. 807.

It is not harmless error that Stroye's statements were ruled inadmissible. That information is likely to have caused the jurors to have reasonable doubt whether Appellant's statements to the FBI that he did not touch Stroye were materially false. The Court should vacate Appellant's conviction and remand

for a new trial.

### III.    The District Court Erred by its Confusing Specific Unanimity Jury Instruction

<u>Standard or Scope of Review</u>. This Court can affirm the District Court only if the error was harmless beyond a reasonable doubt. *U.S. v. Russell*, 134 F.3d 171, 178-181 (3d Cir. 1998).

### Discussion

A specific unanimity instruction is required for false statement charges alleging multiple false statements. *U.S. v. Ryan*, 828 F.2d 1010, 1019 (3d Cir. 1987); *U.S. v. Beros*, 833 F.2d 455, 461-462 (3d Cir. 1987). *See also U.S. v. North*, 910 F.2d 843, 876 (D.C. Cir. 1990). The District Court gave a confusing instruction regarding the specific unanimity required concerning which of several statements alleged in Count 3 Appellant made. That error deprived Appellant of his Sixth Amendment right to a unanimous verdict.

The District Court's final jury charge stated "the Government must prove that at least one of these [four] statements was false." A.13. A specific unanimity instruction had been requested by Appellant's counsel, and after the government's closing argument, Appellant's counsel asked the Court for a clearer instruction that the jurors must be unanimous as to which (if any)

alleged statements they find Appellant made. A.10; 14-15. The Court then instructed that "Charge 36, about the false statements, and I said you only need to find - you're going to have to find one of the four to have met all of the five elements. Remember, your vote has to be unanimous as to those." A.15.

That confusing instruction easily could have been construed by jurors to mean each individual juror must find that at least one – as opposed to all – of the four allegedly false statements were made by Appellant, but not that all jurors had to be unanimous as to which of the statements was made. There is no record support for the proposition that all jurors were unanimous as to any one alleged false statement. Indeed, the juror affidavits make clear that four jurors believed Appellant made no false statements. Each affiant juror states that he/she only voted guilty in compromise for reasons other than that the government proved the allegations of Count 3. *See* Argument Section I. Here, as in *U.S. v. Holley*, 942 F.2d 916 (5th Cir. 1991), "[the] ... instruction does not ...  require that all of the jurors concur in the knowing falsity of at least one particular statement.... [T]here was a reasonable possibility that the jury was not unanimous with respect to at least one statement in each count. The district court therefore erred... and a new trial is required." *Holley*, 942 F.2d at

928-929. This substantial error is of constitutional magnitude. It is not harmless error beyond a reasonable doubt.

Also, the jury deadlocked on Counts 1 and 2 respectively charging Appellant with hate crime assault and excessive force on Stroye. That deadlock further demonstrates there was juror dissent that Appellant even touched Stroye, and therefore whether any alleged statements by Appellant that he did not touch Stroye were false. "[T]he jury instruction at issue was erroneous because it failed to apprise the jury of their responsibility to unanimously agree on the ... [specific false statement made].... Furthermore, the failure to give a proper unanimity instruction constitutes reversible error..." either under a harmless error or plain error standard. *Russell*, 134 F.3d at 182.

In *Russell*, this Court distinguished *U.S. v. Edmonds*, 80 F.3d 810 (3d Cir. 1996), in which the defendant was convicted of every violation alleged to constitute the continuing series for a CCE charge. The Court "did not have to speculate whether the jurors reached agreement as to the identity of each of the three offenses constituting the series [concerning which the unanimity instruction was challenged], because ... [this Court] had a jury verdict which demonstrated that each juror believed the defendant to be guilty of all of the violations constituting the series." *Russell*, 134 F.3d at

181. The same distinction from *Edwards* applies here: it is not axiomatic that the jurors found that Appellant touched Stroye at all, having deadlocked on Counts 1 and 2.

Because there is no basis to find the jury was unanimous as to any one statement, and the District Court's instruction was confusing, appellant's conviction should be reversed.

## IV.    The District Court Erred in its Guideline Calculation

<u>Standard or Scope of Review</u>. The Court has plenary review over a district court's interpretation of Sentencing Guidelines. *U.S. v. Solomon*, 766 F.3d 360, 364 (3d Cir. 2014).

### Discussion

The District Court erred in its guideline calculation. U.S.S.G. §2B1.1 applies to Appellant's conviction under 18 U.S.C. § 1001(a)(2). The §2B1.1 base offense level is 6. U.S.S.G. §2B1.1 (a)(2). No other §2B1.1 adjustments apply. A total offense level 6 and Criminal History Category I produces a 0-6 month guideline range. U.S.S.G §5A (Sentencing Table). The District Court rejected that position and incorrectly applied a cross-reference to U.S.S.G. §2H1.1, pursuant to U.S.S.G. §2B1.1(c)(3)(B), arriving at a 10-16 month range.

U.S.S.G. §2H1.1 has a base offense level 6, but §2H1.1(b)(1) also applies a 6 offense-level increase if "the defendant was a public official ... or the offense was committed under color of law".  The District Court misapplied the cross-reference provision §2B1.1(C)(3)(B), which provides

> If . . . (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001, § 1341, § 1342, or § 1343); **and** (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

U.S.S.G. §2B1.1(c)(3)(B) (bold added). Appellant's false statement conviction does not establish another offense. Count 3 alleges four statements as false:

> a. <u>Question</u>: But you didn't go hands on with anybody?
>
> <u>Nucera</u>: Nope . .. Nope I didn't go hands on, didn't touch anybody, didn't spray anybody.
>
> b. <u>Question</u>: And you didn't cuff anybody?
>
> <u>Nucera</u>: I didn't touch, I didn't touch any of them ... I had nothing to do with the physical arrest or anything, no.
>
> c. <u>Question</u>: If anyone were to say that you, Chief Nucera, used excessive force on anybody at the scene that day ... would that be true?
>
> <u>Nucera</u>: No. I didn't touch anyone.

> d. <u>Question</u> [in reference to Civilian 1 and Civilian 2]: But you didn't have any contact with them?
>
> <u>Nucera</u>: Nah. I didn't touch, I didn't touch them, I didn't talk to them, and I didn't see any of the processing at the station.

A.115-116.

Analysis of the applicability of §2B1.1(c)(3) is limited to those four charged potential bases for Appellant's conviction:

> A plain reading of this unambiguous language [of Section 2B1.1(c)(3)] establishes that the district court may look only to 'the conduct set forth in the count of conviction' when determining whether the cross-reference applies. As such, this cross-reference is applicable 'only if the conduct alleged in the count of the indictment of which the defendant is convicted establishes the elements of another offense' *U.S. v. Genao*, 343 F.3d 578, 583 (2d Cir. 2003)".

*U.S. v. Bah*, 439 F.3d 423, 427 (8th Cir. 2006). *See also U.S. v. Arturo Garcia*, 590 F.3d 308, 315 (5th Cir. 2009).

Here, only the statements denying physical touching are in play. The record clearly establishes Appellant did not pepper spray or handcuff Stroye. The jury did not find Appellant used excessive force.[16]  Also,

---

[16] Counts 1 and 2 allege assault violations on which the jury deadlocked. That the jury clearly did not find sufficient proof that an assault occurred also is evident from the four juror affidavits.

importantly there was no competent instruction (discussed *supra*

Argument Section III) assuring jury unanimity as to any one of the alleged

statements. Appellant's conduct of conviction does not amount to any crime

other than making a false statement, even on a preponderance standard.

Even assuming *arguendo* an assault was established by a

preponderance of the evidence as the District Court determined, that type

offense is not governed by §2B1.1(c). That sub-section applies only to

fraudulent conduct covered by another guideline, not <u>non-fraudulent</u>

conduct like assault.

Application Note 17 to U.S.S.G. §2B1.1 provides:

> Cross Reference in Subsection (c)(3).—Subsection (c)(3) provides a cross reference to another guideline in Chapter Two (Offense Conduct) in cases in which the defendant is convicted of a general fraud statute, and the count of conviction establishes an offense involving *fraudulent conduct* that is more aptly covered by another guideline.

U.S.S.G. §2B1.1, comment. (n17)(italics added). The Sentencing

Commission provided examples of when the count of conviction establishes

another offense of "fraudulent conduct... covered by another guideline",

which examples differ from the instant case. Examples are when a

defendant makes false entries regarding currency transactions to which

§2S1.3 (Structuring Transactions) would be more apt; makes false

statements to a customs officer for which §2T3.1 would be more applicable; or where broader mail or wire fraud statutes used mostly as jurisdictional bases for prosecution of other offenses like as bribery or extortion (more aptly considered under §2C1.1). U.S.S.G. §2B1.1, comment. (n.1). Here, Appellant's alleged false statements merely denied he touched Stroye.

U.S.S.G. §2H1.1 applies to the following statutory provisions: 18 U.S.C. §§ 241, 242, 245(b), 246, 247, 248, 249, 1091; 42 U.S.C. § 3631. Among those enumerated are the crimes charged in Counts One and Two of the indictment, regarding which the jury was deadlocked, and which do not meet the "fraudulent conduct" requirement for application of the cross-reference under U.S.S.G. §2B1.1(c)(3).

Courts have approved application of §2B1.1(C)(3) for convictions pursuant to 18 U.S.C. §1001 only when the false statement also constituted a separate fraud offense. *See e.g.*, *U.S. v. Genao*, 343 F.3d 578 (2d Cir. 2003) (false statement also constituted obstruction of justice). By contrast, an assault cannot be accomplished by a false statement.

The District Court erred by applying §2H1.1. Appellant's sentence should be vacated, and the matter remanded for resentencing.

## V.    The District Court's Sentence Is Unreasonable and the Court Incorrectly Interpreted Guideline Policy Statements

<u>Standard or Scope of Review</u>. The Court has plenary review over a district court's interpretation of the guidelines. *Solomon*, 766 F.3d at 364. Sentences are reviewed for reasonableness using an abuse of discretion standard. *U.S. v. Seibert*, 971 F.3d 396, 399 (3d Cir. 2020).

### Discussion

The District Court incorrectly interpreted several guideline policy statements, and the sentence was unreasonable. The Court determined a 10-16 month guideline range (which should have been 0-6 months as discussed *supra* Section IV). Further, the District Court upward varied to a 28-month sentence applying factors under 18 U.S.C. § 3553(a). That sentence is unreasonable and greater than necessary.

To support its variance, the Court erroneously interpreted policy statement U.S.S.G. §5K2.9, which provides for upward departure consideration when the offense of conviction was committed to facilitate or conceal another offense, to reflect the actual seriousness of the offense. A.70-71. Assuming *arguendo* the District Court's application of U.S.S.G. §2H1.1 to arrive at a 10-16 month range was warranted, its variance based on the §5K2.9 policy statement was error. Section 5K2.9 may be considered

only "[i]f the offense guideline in Chapter Two **...** does not adequately take [the]...circumstance into consideration in setting the offense level for the offense, and only to the extent not adequately taken into consideration." U.S.S.G. §5K2.0(a)(2)(A), p.s. The District Court's interpretation of §5K2.9 was erroneous. <u>First</u>, the six-level enhancement pursuant to U.S.S.G. §2H1.1(b)(1) already accounted for the seriousness of the charges in Counts 1 and 2 (of which Appellant was not convicted). <u>Second</u>, no circumstances exist such that Appellant's alleged conduct can be characterized as an exceptional case allowing for consideration even though the circumstance already has been accounted for in determining the guideline range. Certainly, none is present to a degree substantially in excess of that ordinarily is involved in the offense. U.S.S.G. §5K2.0(a)(3), p.s.

Although the Court cited that Appellant was Chief and assaulted a handcuffed person, those circumstances do not significantly vary from other cases. Contrary to the Court's statement that Appellant's "lies significantly differ from the norm" (A.71), Appellant's "lie" was only denial of touching Stroye. Appellant presented in his Sentencing Memorandum several cases demonstrating his conduct was not significantly different from other cases, yet his sentence is. Those cases involved officers convicted of crimes including civil rights violations (of which Appellant has

not been convicted), with victims more severely injured than the minor

physical injuries alleged to have been sustained by Stroye[17], and with

affirmative cover-ups. Those cases[18] are referenced in this chart:




REMAINDER OF PAGE INTENTIONALLY BLANK




---

[17] A.231-235 (D-701 redacted medical records).

[18] *See also* A.298-316.

| | | |
|---|---|---|
| Police Officer Michael Brown convicted of beating and use of a taser on a 19 y/o male who suffered substantial injury | 3 yrs. Probation w/ 180 days house arrest [prosecutors asked for 21-27 months] | S.D.Fl. (2/27/19) |
| Las Vegas Police Officer Richard Scavone convicted of civil rights violation for <u>repeatedly</u> slamming handcuffed woman's head on police car, grabbing her around neck and throwing her to ground causing permanent injuries to face, teeth, neck and back | 1 yr. incarceration and 1 year supervised release | D.Nv. (1/12/18) |
| Police Officer Christopher M. Roeder convicted after trial of deprivation of rights under color of law and false police report; broke arrested man's nose in several places requiring surgery | 14 mos. incarceration; 1 yr. supervised release | D. Mass. (6/20/19) |
| Veterans Affairs Police Officer Michael Kaim convicted of excessive force in deprivation of civil rights by striking a patient and falsifying police report about it falsely saying the man was aggressive meriting the response | 12 mos. incarceration and $1,000 fine | S.D. Ind. (9/18/2018) |

Section §5K2.9 also is inapplicable because Appellant's alleged false statement(s) did not facilitate or successfully conceal the alleged assault. Appellant was the only suspect. The FBI was not misdirected based on Appellant's statements. *U.S. v. Cherry*, 10 F.3d 1003, 1012 (3d Cir. 1993) ("[T]the district court erred in departing upward by two levels pursuant to section 5K2.9 as the undisputed facts reveal that Cherry's unlawful flight did not facilitate or conceal the murder of Officer Burke and therefore section 5K2.9 is inapplicable.").

The District Court also erroneously considered policy statement U.S.S.G. §5K2.7  as applicable to its upward variance analysis. A.71. The Court ignored that part of §5K2.7 which provides that to support an upward departure, a governmental function must have been substantially disrupted: "If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected." U.S.S.G. §5K2.7, p.s. Here, that did not occur. There is no evidence to support any conclusion Appellant's statement(s) significantly disrupted a governmental function. There is no evidence FBI agents ever believed Appellant or that his statements in any way interfered with their investigation. The FBI did

not go down any rabbit holes because of alleged false statements by Appellant.

The District Court erred by considering §5K2.7 also because it does not apply when, as here, the offense of conviction involves false statement. "Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference." U.S.S.G. §5K2.7, p.s. No such qualifying circumstances exist here. Lying to the FBI and any impact on investigation (although none occurred here) is inherent in the offense of lying to the FBI in connection with an investigation. *Cf. U.S. v. Baird*, 109 F.3d 856, 871 (3d Cir. 1997)(upholding an upward departure based on U.S.S.G. §5K2.7 where a corrupt police officer's conduct resulted in the "city [of Philadelphia] ... already set[ting] aside more than one hundred and fifty ... convictions, leading to the release of innocent persons from prison. As a result ... many individuals have instituted civil lawsuits seeking damages from the city. The city stands to be liable for enormous sums of money. In other words, the disruption Baird caused is not only by no means ordinary....").

The other factors for consideration under 18 U.S.C. § 3553 make clear that the 28-month sentence is unreasonable and greater than necessary, considered against either the 0-6 month guideline range urged by Appellant or the higher 10-16 month range determined by the District Court. Those factors, supported by the PSR, aspects of the trial testimony summarized in the Statement of Facts above, and the sentencing materials submitted[19] to the District Court (beginning at A.243) established that:

➢ Appellant had a long history of emotional and financial support to his mother and siblings and even more so after his father abandoned the family when Appellant was just 18 years old.

➢ Appellant had a sustained work history throughout his life (PSR ¶54).

➢ Appellant honorably served his country in the Air Force service and Reserves (PSR ¶53).

➢ the alleged actions/statements of 2016 were late in Appellant's long and otherwise positive police career which began in 1982 (PSR ¶54).

➢ Appellant's served the Bordentown Township as a Business Administrator and Chief who truly put the needs of the community first, and as PO Mount testified Appellant cared deeply about the

---

[19] These documents were attached to Appellant's Sentencing Memorandum.

community.

➢ Appellant had substantial personal and charitable service to the community over his lifelong residence there, which he also fostered in his children, as described in character letters submitted in connection with sentencing (A.236), and in the oral statements of character witnesses at sentencing (A.48-58).

➢ Appellant suffered substantial financial and emotional expense because of the charges, including public vilification. A.26-28, 73; PSR ¶56.

➢ Appellant suffered termination of his pension benefits earned over a 34-year career, a particularly disproportionate result considering the late nature of the alleged conduct in the span of that career. A.64.

➢ Appellant was age 64 (PSR at 2) at time of sentencing and unlikely to recidivate.

➢ Appellant lacks any prior criminal history. PSR ¶¶35-38.

The Court should vacate Appellant's sentence and remand for resentencing.

# **CONCLUSION**

The Court should grant the specific relief requested in each Argument section, which are plead in the alternative and include: vacating Appellant's conviction and granting a new trial; remanding the matter for an evidentiary hearing on Appellant's post-verdict motion; vacating Appellant's sentence and remanding for resentencing.

Respectfully submitted,

*/s/Rocco C. Cipparone, Jr.*
Rocco C. Cipparone, Jr. Esquire
Law Offices of Rocco C. Cipparone, Jr.
203-205 Black Horse Pike
Haddon Heights, NJ 08035
856-547-2100
856-547-2225 (Fax)
Courtnotices@cipparonelaw.com
Attorney for Appellant

Dated: February 14, 2022

## <u>REQUIRED CERTIFICATIONS</u>

The undersigned certifies as follows:

1.    **Bar Membership**. I am a member in good standing of the Bar of this Court.

2.    **Type-Volume**. This brief was prepared in 14-point Georgia, proportional typeface. According to the word-count function in Microsoft Word for Office 365, this brief contains 12,852 words, exclusive of the cover page, table of contents, table of authorities, certifications, and signature block, complying with the 13,000-word limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

3.    **Electronic Filing; Paper Copies**. The electronic version of this brief filed with the Court was automatically scanned by Microsoft Defender and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court (excepting only any format changes that may have occurred in the .pdf conversion).

*/s/Rocco C. Cipparone, Jr.*
Rocco C. Cipparone, Jr.  02-14-2022

## **CERTIFICATE OF SERVICE**

On February 14, 2022, I served a copy of the foregoing brief and the

accompanying Appendix on counsel for the United States, via ECF filing and

first class mail (within 5 days after ECF filing), addressed to:

Mark E. Coyne, Esquire
Chief , Appeals Division
U.S. Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark NJ 07102-2535

*/s/Rocco C. Cipparone, Jr.*
Rocco C. Cipparone, Jr.
