# No. 21-2115

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### UNITED STATES OF AMERICA,

### v.

### FRANK NUCERA, JR.,
### Defendant-Appellant

**On Appeal from Judgment of Conviction and Sentence
in the United States District Court for the District Of New Jersey
No. 1:17-cr-00532-RBK-1 (Robert B. Kugler, J.)**

### APPELLANT'S APPENDIX Vol.1 (pp. A.1-A.85)

*ROCCO C. CIPPARONE, JR., ESQUIRE*
**Law Offices of Rocco C. Cipparone, Jr.
205 Black Horse Pike
Haddon Heights, NJ 08035
(856) 547-2100
Fax: (856) 547-2225
www.CipparoneLaw.com**

**Counsel for Appellant**

# TABLE OF CONTENTS

## VOLUME 1

Notice of Appeal ................................................................... A.1

Oral Ruling – Admissibility of Statements ...........................A.2

Oral Ruling – Specific Unanimity Jury Instruction ............ A.10

Order (denying Motion to Vacate Conviction).................... A.16

Oral Ruling (denying Motion to Vacate Conviction)........... A.18

Sentencing Transcript (contains Oral Rulings) .................A.23

Judgment in a Criminal Case ........................................... A.81

## VOLUME 2

District Court Docket Sheet ..............................................A.86

Indictment .....................................................................A.108

Written Juror Questionnaire (juror Richardson) .............A.118

Transcript (juror Richardson Oral *Voir Dire*).................. A.147

Facebook Post (juror Richardson) ...................................A.157

Philadelphia Inquirer Article ..........................................A.160

Affidavit – juror Cunningham.........................................A.165

Affidavit – juror Neiman................................................ A.179

Affidavit – juror Viscome...............................................A.188

**Affidavit – juror Cianfrani** ................................................. **A.201**

**Government Exhibit 134-T** ...............................................**A.211**

**Government Exhibit J-ST-10** ........................................... **A.216**

**Select Trial Transcript Portions** ...................................... **A.218**

## VOLUME 3

**D-701 (Burlington County Jail medical records)** .............. **A.231**

**Appendix to Sentencing Memorandum** ...........................**A.243**

**Government Exhibit (GE) J-EA-2** ....................................**A.324**

**Defense Exhibit D-179-T** .................................................**A.325**

**GE-154-T** .........................................................................**A.330**

**GE-131-T** .........................................................................**A.356**

**NOTE: PSR & STATEMENT OF REASONS SEPARATELY
FILED SEPARATELY AND HAR COPIES IN SEALED
ENVELOPES**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Full Caption in District Court:                    Docket No.:    17-532-RBK

UNITED STATES OF AMERICA

(Plaintiff)                                        Judge: Hon. Robert B. Kugler

v.                                                 **PRO SE Notice of Appeal to**
**the U.S. Court of Appeals for**
FRANK NUCERA, JR.                                  **the Third Circuit**
(Defendant)

Notice is hereby given that      FRANK NUCERA JR.
(Named Party)

appeals to the United States Court of Appeals for the Third Circuit from

[X] Judgment, [X] Order, [X] Other  Conviction, Sentence, Pretrial Rulings, Post-Verdict Motion
(Specify)                      Rulings

of the United States District Court, District of New Jersey, entered in this action on

May 26, 2021    (judgment date)

(Date)
Appellant requests that counsel be appointed under the Criminal Justice Act and in connection
with such request will also submit a Financial Affidavit CJA form 23.

Dated:    May 26, 2021

Appellant FRANK NUCERA JR., PRO SE

11 Germantown Road
Street

Bordentown, NJ  08505
City, State, Zip

Telephone

**A.1**

1    MS. LORBER:  She's not a hundred percent clear on

2  that, but I think it's still relevant.

3    THE COURT:  The board -- whoever it is, had the

4  authority to terminate your client is what I think she will

00:05    5  help establish.  I think we've already established by

6  inference from other witnesses, Pesce said that's why he was

7  going to go to the committee with this information, because

8  the committee, the town committee had the authority to

9  terminate him.

00:05   10    MR. CIPPARONE:  Well, I think there's another layer.

11  There's got to be a hearing, and there's a different governing

12  body that makes that decision.

13    THE COURT:  I don't know.

14    MR. CIPPARONE:  But I think there is another layer,

00:06   15  but I put my position on, Judge.  I understand your ruling.

16    THE COURT:  Okay.

17    MR. CIPPARONE:  The other issue, and the Government

18  wanted to address this, you're aware that from the pretrial

19  motions that I do intend to start to ask Agent Addison about

00:06   20  the statements Stroye made that he got hit, pushed into the

21  first floor door, his head and shoulder hit the first floor

22  door and the police cruiser vehicle.  I did a little bench

23  memo for you and the Government.

24    THE COURT:  But you forgot to send it to me.

00:06   25    MR. CIPPARONE:  No, I did it like 1:00 in the

**A.2**

1   morning, 1:30 in the morning.

2        MR. GRIBKO:  That's never stopped you before.

3        MR. CIPPARONE:  I've never sent anything to the Judge

4   at that time.  But I figured -- it's short and it's not very

00:06  5   polished because it was, by its nature.  But the gist of it is

6   basically there's two arguments.

7        The first is that I'm not offering it for the truth,

8   I'm offering it to show that the FBI failed to pursue certain

9   avenues of investigation, consider other possibilities of who

00:06  10  might have struck Stroye in their investigation.  Could have

11   been Roohr, could have been -- the only two guys -- there's

12   only three guys in the car with him where he says he got hit.

13   It's Roohr, Guido, and Nagle.  Two of those three are putting

14   Nucera in the soup here.  So if they struck him, maybe they

00:07  15  got an additional motivation.

16        THE COURT:  Do you know where this is going to end

17   up?  You're going to open the door for them to say, well, why

18   did you decide to address Mr. Nucera.  That's what's going to

19   happen.  They're going to get all these, we thought this, we

00:07  20  did this, we thought this, we heard that.

21        MR. CIPPARONE:  I hoped --

22        THE COURT:  And we believed -- we believed the

23   statements made by Roohr and Guido --

24        MR. CIPPARONE:  Sure.

00:07  25        THE COURT:  -- and we think your client's a liar.

**A.3**

1 You're going to open all that up and get all of that opinion

2 if I let this in.

3        MR. CIPPARONE:  No, get it, but I think it's such

4 important evidence that the alleged victim says he's hit and

00:07   5 injured at a location and with the physical description of a

6 person that doesn't match my client and that the location

7 where every witness says he couldn't have been in at the time,

8 I think that's pretty potent.  I'm remiss if I don't try to

9 present that to the jury.

00:08  10        MS. LORBER:  We also have made Stroye available.  We

11 subpoenaed him.  He's going to be in the courthouse today at

12 11 o'clock.

13        MR. CIPPARONE:  But that's irrelevant, as long as I

14 have a non-hearsay basis, the Government doesn't get to choose

00:08  15 how I present my evidence.  I have -- I argued that in a

16 non-hearsay basis for that evidence, and therefore I should be

17 able to pursue it that way.

18        THE COURT:  I think you certainly can argue that the

19 FBI didn't pursue certain leads.  I mean, defense counsel in

00:08  20 any criminal case can always argue that the investigating

21 agency didn't pursue the leads.  The question is whether or

22 not the specific statements are admissible, and I don't think

23 they are admissible under Rule 403.  I think the prejudice

24 greatly outweighs the relevance.

00:08  25        You can establish, by asking the right questions of

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | the FBI agents, that they had the opportunity and they had                    |
|       | 2  | reason to look at these three guys as the possible assaulters,               |
|       | 3  | based on their investigation in the case.  And you can ask why               |
|       | 4  | they didn't, or you can just leave it at that, that they                     |
| 00:09 | 5  | didn't.  But I think under Rule 403 is the prejudice since --                |
|       | 6  | and he is available today if you want to put him on the stand.               |
|       | 7  | God knows what he'll say today.  Greatly outweighs any                       |
|       | 8  | relevance of the specific statement, because the relevance you               |
|       | 9  | want to get at is the failure to pursue an investigation in                  |
| 00:09 | 10 | this case and the failure to look at other potential people in               |
|       | 11 | this case based on what they knew.  So I'm going to continue                 |
|       | 12 | to sustain the objection, but you certainly are welcome to                   |
|       | 13 | question the FBI agents about the avenues that they took.                    |
|       | 14 | MR. CIPPARONE:  Just, Judge, understanding your                             |
| 00:09 | 15 | ruling, I do intend to ask him without getting into the                      |
|       | 16 | substance, you had conflicting information that conflicted                    |
|       | 17 | with what Roohr said and what Guido said, and I can even say                 |
|       | 18 | that's from Stroye.  That's not getting into what the                        |
|       | 19 | information, is that they had conflicting information about                   |
| 00:09 | 20 | where it happened and the description of what happened,                       |
|       | 21 | without getting into what the statement was, that they had                    |
|       | 22 | conflicting information that they failed to act upon, and I                   |
|       | 23 | think that --                                                                |
|       | 24 | THE COURT:  You can leave it at that.                                        |
| 00:10 | 25 | MR. CIPPARONE:  Yeah.                                                        |

 1          THE COURT:  We're not going to mention Stroye.

 2          MR. CIPPARONE:  Okay.  I understand.  Do you mind if

 3  I file this on the record just to preserve my arguments?

 4          THE COURT:  Do you want to electronically file it?

00:10        5          MR. CIPPARONE:  I can e-file it later.

 6          THE COURT:  E-file it later.

 7          MR. CIPPARONE:  Okay.  That way I don't have to --

 8          MS. LORBER:  To be clear, the question is going to be

 9  that you received conflicting information from other sources?

00:10       10          MR. CIPPARONE:  No, I'm going to say from Stroye.

11          MS. LORBER:  No, the Judge just said you can't say

12  that.

13          THE COURT:  No.

14          MR. CIPPARONE:  Okay, okay.

00:10       15          THE COURT:  From your interviews, whatever it is you

16  want to tell him.

17          MR. CIPPARONE:  Okay, I got it.

18          MS. LORBER:  Thank you, Your Honor.

19          MR. CIPPARONE:  Thank you, Judge.

00:10       20          (END OF SIDEBAR.)

21          THE COURT:  So we're ready to go?

22          MR. CIPPARONE:  Yes.

23          THE DEPUTY CLERK:  All rise.

24          (JURY ENTERS; 9:10 a.m.)

00:12       25          THE COURT:  Have a seat, please.  Everyone had a good

**A.6**

——— ADDISON - RECROSS - CIPPARONE ———

1    two saw it, according to them, correct?

2    A.   The two that were in a position to see it, yes.

3    Q.   Guido and Roohr?

4    A.   Yes.

04:34    5    Q.   And Guido kind of only half says it, right?  Because he

6    doesn't independently remember it.  He ties it to his watching

7    the video and walking Stroye out --

8          MS. LORBER:  Objection.  He's asking this witness to

9    characterize the testimony that the jury already heard from

04:34   10    Detective Sergeant Guido.

11          THE COURT:  Which we've done a dozen times.

12          MR. CIPPARONE:  Fine, I don't need to beat a dead

13    horse, your Honor.

14          THE COURT:  Thank you.

04:35   15    BY MR. CIPPARONE:

16    Q.   And included in those 40 to 50 witnesses was Timothy

17    Stroye that you interviewed, correct?

18    A.   That's correct.

19    Q.   Now, the contradictory information that Ms. Lorber just

04:35   20    asked you about, that came from a person who was in a very

21    good position --

22          MS. LORBER:  Objection.

23          THE COURT:  Let's go to sidebar.

24                    (Sidebar)

04:35   25          THE COURT:  I thought I said you were not to mention

*United States District Court*
*Camden, New Jersey*

**A.7**

ADDISON - RECROSS - CIPPARONE

1  Stroye having given a statement.

2          MR. CIPPARONE:  You said I could mention he gave a

3  statement.  He was interviewed.  She asked was he interviewed.

4  I can -- I'm not getting into the statement --

04:35    5          THE COURT:  The name "Stroye" was not supposed to

6  come up at all.

7          MR. CIPPARONE:  Well, in terms of what he said, yes.

8  That was what I interpreted it as, Judge.

9          THE COURT:  No.  I said you weren't supposed to ask

04:36   10  any questions about Stroye, indicate that Stroye gave a

11  statement.

12          MR. CIPPARONE:  I honestly did not interpret it that

13  way, Judge.

14          THE COURT:  I'm not admonishing you.  I'm just

04:36   15  telling you my understanding.

16          MR. CIPPARONE:  No, and I'm telling you if I

17  misinterpreted that, I apologize, but that was my honest

18  interpretation.

19          THE COURT:  What's coming next?  What's the next

04:36   20  question going to be?

21          MR. CIPPARONE:  The information that you say you

22  discounted came from a person in a physical position that was

23  proximate to where -- you know, in a very good position to

24  observe or know what happened to Stroye?

04:36   25          THE COURT:  I don't know that you can say that Stroye

ADDISON - RECROSS - CIPPARONE

04:36

1    was in a good position to know who struck him and who pushed

2    him.  You can certainly -- he may not buy that.  Stroye was

3    certainly at the scene when it happened, but I'm not so sure

4    Stroye was in a position to identify anything.  But --

5              MR. CIPPARONE:  Maybe I will just rephrase it and say

6    who was in a position to be near Stroye, very near Stroye when

7    he was struck, if he was struck.

8              THE COURT:  You can say he was at the scene.

9              MR. CIPPARONE:  The problem is, Judge, the government

10   makes it sound like -- it's really misleading to this jury at

11   this point to suggest that there are 50 persons who didn't see

12   it, when the victim says I got hit into the door and into the

13   car, on the first floor.

14             MS. LORBER:  Well, you can call him the victim.  If

15   you want to call him the victim, you can.

16             THE COURT:  We've been down that road already.

17             MR. CIPPARONE:  I get it, Judge.

18             THE COURT:  I made my ruling under 403 and the

19   balancing test and unfair prejudice and all that, and we're

20   not going to revisit that.

21             MR. CIPPARONE:  Okay.  I understand.

22             MR. GRIBKO:  I also note that whatever questions

23   Mr. Cipparone now asks is immediately following you just

24   talked to Mr. Stroye, so I think any question he asks is

25   suspect because it's going to be implied by the jury that this

ADDISON - RECROSS - CIPPARONE

1    THE COURT:  Yes.  Okay.

2    MR. CIPPARONE:  Next I have, Judge, is with respect

3  to Paragraph 40.  Well, it's in this general vicinity of

4  instructions regarding the false statement claim.  The

07:15    5  indictment is very specific that it's only certain particular

6  statements that Mr. Nucera is charged with.  And I think if we

7  don't specify to the jury that it's got to be one of those

8  statements, and not any other false statement, because the way

9  it's worded now, they could think there was something else

07:16    10  falsely said that would be a basis for a conviction.

11    THE COURT:  That's fair.

12    MR. CIPPARONE:  I think it's Paragraph 15(a) through

13  (d), Judge.

14    MS. LORBER:  Give me a minute.  Yes.

07:16    15    MR. GRIBKO:  Put that at the end of Paragraph 40,

16  specifically, the government alleges that the defendant made

17  the following statements which were -- that the following

18  statements made by the defendant were false?

19    MR. CIPPARONE:  Right, and then it has to be one

07:16    20  of -- one or more of those statements which they find beyond a

21  reasonable doubt was false and, you know, et cetera, et

22  cetera.

23    THE COURT:  All right.  So we'll just take that of

24  Paragraph 15 of the indictment.

07:17    25    MR. CIPPARONE:  And that is it for me, Judge.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,          CRIMINAL NUMBER:

       v.                          17-532

FRANK NUCERA, JR.,                       TRIAL

     Defendant.

Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey  08101
October 2, 2019

B E F O R E:                THE HONORABLE ROBERT B. KUGLER,
                           SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

    OFFICE OF THE UNITED STATES ATTORNEY
    BY: MOLLY S. LORBER
       R. JOSEPH GRIBKO
    ASST. UNITED STATES ATTORNEYS
    FOR the Government

    ROCCO C. CIPPARONE, JR., ESQUIRE
    203-205 BLACK HORSE PIKE
    HADDON HEIGHTS, NEW JERSEY 08035
    FOR THE DEFENDANT

Carl J. Nami, Official Court Reporter
Carl_Nami@NJD.USCOURTS.GOV
609-439-5420
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

      1  18 United States Code Section 1001 states in pertinent part:

      2  Except as otherwise provided in this section, whoever, in any

      3  matter within the jurisdiction of the Executive, Legislative,

      4  or Judicial branch of the Government of the United States,

01:27 5  knowingly and willfully makes any materially false,

      6  fictitious, or fraudulent statement or representation shall be

      7  guilty of an offense against the United States.

      8       In order for you to find Frank Nucera, Jr. guilty of

      9  making a false statement to the FBI as alleged in Count Three

01:27 10 of the indictment, you must find that the Government proved

     11  beyond a reasonable doubt each of the following elements:

     12       First, that on or about December 22, 2016, the

     13  defendant made or caused to be made a statement or

     14  representation.

01:27 15      Second, that this statement or representation was

     16  material.

     17       Third, that the statement or representation was false,

     18  fictitious or fraudulent.

     19       Fourth, that the false, fictitious or fraudulent

01:28 20 statement was made knowingly and willfully.

     21       And fifth, that the statement was made in a matter

     22  within the jurisdiction of the Government of the United

     23  States.

     24       The first element the Government must prove beyond a

01:28 25 reasonable doubt is that the defendant made a statement or

*1721*

1  representation to the Government on or about December 22,

2  2016.  Specifically, the Government alleges the following

3  statements were false:

4       A. Question:  "But you didn't go hands-on with

01:28  5  anybody?"

6       Nucera:  "Nope, nope, I didn't go hands-on, didn't

7  touch anybody, didn't spray anybody."

8       B. Question:  "And you didn't cuff anybody?"

9       Nucera:  "I didn't touch, I didn't touch any of them.

01:28  10  I had nothing to do with the physical arrest or anything.

11  No."

12       C. Question:  "If anyone were to say to you Chief

13  Nucera used excessive force on anybody at the scene that day,

14  would that be true?"

01:28  15       Nucera:  "No.  I didn't touch anyone."

16       D. Question, in reference to Civilian One and

17  Civilian Two:  "But you didn't have any contact with them?"

18       Nucera:  "No, I didn't touch, I didn't touch them.  I

19  didn't talk to them, I didn't see any of the processing at the

01:29  20  station."

21       The Government must prove that at least one of these

22  statements was false.  Under the statute, there is no

23  distinction between written and oral statements.

24       The second element that the Government must prove

01:29  25  beyond a reasonable doubt is that Frank Nucera, Jr.'s

**A.13**

```
         1   see you shortly.

         2          THE DEPUTY CLERK:  All rise.

         3          (The Jury left the courtroom at 11:20 a.m.)

         4          THE COURT:  Okay.  We'll see you in ten minutes.

02:45    5          MR. CIPPARONE:  Something occurred to me when I was

         6   listening again to Mr. Gribko.  I think we probably have to

         7   instruct the jury that they have to view --

         8          THE COURT REPORTER:  I'm sorry, I can't hear you.

         9          MR. CIPPARONE:  -- as to any particular false

02:45   10   statement, meaning --

        11          THE COURT REPORTER:  I'm sorry, I'm having trouble

        12   hearing you.  There is a lot of noise in here.

        13          THE COURT:  He wants me to charge as to the four

        14   statements.  They have to be unanimous as to any one of the

02:45   15   four.

        16          MR. CIPPARONE:  Yes.  It just hit me now.

        17          THE COURT:  That's okay.  I'll tell them when they

        18   come back.

        19          MR. CIPPARONE:  All right.  Thank you.

02:45   20   (A recess was taken at 11:22 a.m.)

        21          (OPEN COURT; 11:30 a.m.)

        22          THE COURT:  As soon as you're ready, Mr. Cipparone,

        23   we will get them out.

        24          Let's get the jury out.

02:57   25          THE DEPUTY CLERK:  All rise.
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | (JURY ENTERS; 11:34 a.m.)                                     |
|       | 2  | THE COURT:  All right.  Have a seat, ladies and              |
|       | 3  | gentlemen.  Before we hear from Mr. Cipparone, I just want to |
|       | 4  | make sure I made myself clear.                                |
| 02:58 | 5  | Charge 36, about the false statements, and I said you        |
|       | 6  | only need to find -- you're going to have to find one of the  |
|       | 7  | four to have met all of the five elements.  Remember, your   |
|       | 8  | vote has to be unanimous as to those.                         |
|       | 9  | Okay.  Mr. Cipparone.                                         |
| 02:58 | 10 | MR. CIPPARONE:  Thank you, Your Honor.  Good morning,        |
|       | 11 | again, ladies and gentlemen.  I never have and I'm not now   |
|       | 12 | writing off those ugly embarrassing things Frank Nucera said.|
|       | 13 | I didn't write them off.  I dealt with them in my opening with|
|       | 14 | you, I understand they're there and they're part of this case,|
| 02:59 | 15 | but as I said in my opening, I hope that you don't confuse   |
|       | 16 | criminal justice with social justice.  They are two different|
|       | 17 | things.                                                       |
|       | 18 | And I'm not asking you not to consider the words, I'm       |
|       | 19 | not telling you to ignore them, I'm telling you to look at the|
| 02:59 | 20 | evidence that was presented and the lack of evidence that    |
|       | 21 | gives rise to the reasonable doubt.                           |
|       | 22 | Social justice can punish words, criminal justice           |
|       | 23 | can't, and the case that the prosecution has, is still, keep |
|       | 24 | coming back and back and back to those words.  Let's move past|
| 02:59 | 25 | the words, as ugly and embarrassing and disgusting as they are|

<u>NOT FOR PUBLICATION</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Criminal No. 17-532 (RBK) |
| | : | |
| v. | : | **ORDER** |
| | : | |
| FRANK NUCERA, JR., | : | |
| | : | |
| Defendant. | : | |

**KUGLER**, United States District Judge:

  **THIS MATTER** having come before the Court upon on Defendant Frank Nucera, Jr.'s Motion (Doc. No. 139) to vacate his conviction on Count III of the Indictment and to seal the record as to the names of the jurors; and the Court having considered the moving papers and arguments of counsel; and for the reasons expressed on the record at the hearing on January 29, 2020

  **IT IS HERBY ORDERED** that Defendant's Motion is **DENIED;** and

  **IT IS FURTHER ORDERED** that Defendant shall file unredacted versions of his moving papers on or before February 5, 2020.

Dated:  1/29/2020        /s/ Robert B. Kugler
                ROBERT B. KUGLER
                United States District Judge

**A.16**

1

```
1                    UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF NEW JERSEY
3   _____

    UNITED STATES OF AMERICA           CRIMINAL NUMBER:
4
              v.                       1:17-532-001 (RBK)
5
    FRANK NUCERA JR.,                  MOTION HEARING
6
              Defendant.               Pages 1 - 64
7
    _____
8        United States Courthouse
         One John F. Gerry Plaza
9        4th and Cooper Streets
         Camden, New Jersey 08101
10       Wednesday, January 29, 2020
         Commencing at 11:40 a.m.
11
    B E F O R E:          THE HONORABLE ROBERT B. KUGLER,
12                        UNITED STATES DISTRICT JUDGE

13  A P P E A R A N C E S:

14       OFFICE OF THE UNITED STATES ATTORNEY
         BY:   MOLLY SELZER LORBER, ASST. UNITED STATES ATTORNEY
15             JOSEPH GRIBKO, ASST. UNITED STATES ATTORNEY
         401 Market Street
16       Camden, NJ 08101
         For the Government
17
         LAW OFFICE OF ROCCO C. CIPPARONE, JR.
18       BY:  ROCCO C. CIPPARONE, JR., ESQUIRE
         203-205 Black Horse Pike
19       Haddon Heights, NJ 08035
         For the Defendant
20
    A L S O   P R E S E N T:
21
         FRANK NUCERA JR, Defendant
22       JOHN PACCIONE, U.S. Probation Office

23           Karen Friedlander, Official Court Reporter
                  friedlanderreporter@gmail.com
24                      856-756-0160

25   Proceedings recorded by mechanical stenography; transcript
              produced by computer-aided transcription.
```

*United States District Court*
*Camden, New Jersey*

**A.17**

1   respectfully, Your Honor, that would be a miscarriage of

2   justice.  And to use Ms. Lorber's words, that undermines the

3   jury system in total.

4          And Ms. Lorber says, you know, we don't want to look

5   behind the curtain.  But when we look behind the curtain, we

6   shouldn't dodge reality.  We pull the curtain back and there's

7   not a wizard but a guy pretending to be one.  And here, if we

8   pull back a curtain, there's not a fair and impartial and

9   honest juror, there's a juror pretending to be one.  I submit

10  that all of the circumstances, Your Honor, a new trial is

11  warranted here and vacating the conviction is warranted.

12  Thank you.

13         THE COURT:  Thank you.  Well, first, the motion to

14  seal and protect the identity of these jurors is denied.  It's

15  a public record who they are.  There's already been a

16  newspaper article that purports to name them, so there's no

17  point in that anymore, in trying to keep secret the names of

18  these jurors.  The Court certainly never promised them that

19  they would be anonymous.  No counsel had made, pretrial, any

20  motion to keep the names of the jurors from public view.  So

21  that's denied.

22         The motion for a new trial is going to be denied and

23  I'm not even going to be able to find that there's sufficient

24  evidence to conduct an evidentiary hearing.  There's no clear,

25  strong evidence of juror misconduct here.  Let me go through

1   this.  Some of what I said, I'm just going to be repeating.

2        As to the allegation of Juror No. 12 lying during

3   voir dire, I think the government is correct, I can't even

4   inquire into that at this point.  But even if I were, I would

5   not find that Juror No. 12 lied to us during the course of

6   voir dire.

7        She, in my mind, and I spent some time talking to

8   her, disclosed to us, maybe not in the detail as indicated in

9   these affidavits, but the interaction her kids had with the

10  police.  She made no effort to hide that from us that this had

11  happened.  This was part of her life experience.  She said to

12  us that she felt that she could separate the words from the

13  deeds.  And we've been through this, she said as someone rises

14  in a profession, it's less likely that they're going to act on

15  the words they speak, but she never said, never ever said that

16  she would never find that someone acted in accordance with

17  their words.

18        I concluded she could be fair or I would have excused

19  her.  I think all counsel concluded she would be fair.  I

20  asked defense counsel if they had any challenges at the time

21  and he said no, he felt she could be fair.  She told us she

22  could be fair.  She wasn't lying when she told us she could be

23  fair.

24        When she spoke to the Inquirer, she had had the

25  benefit of hearing the evidence and it was a heck of a lot

1  more evidence of words and deeds than we had indicated in the

2  voir dire that she would hear.  I think all counsel may have

3  underestimated how powerful a symbol, the threat to use dogs

4  is in some people's minds.  She certainly wasn't aware in the

5  voir dire that that was going to be part of the government's

6  case.  And when you add that to the evidence that she heard

7  and obviously believed from the other police officers, that

8  this alleged assault did occur, I can understand why she said

9  that she assumed at that point, having heard all of the

10  evidence, that the defendant acted in accordance with the

11  words that he spoke.

12         So I would not find that she lied.

13         The anti-impeachment rules are very strong and very

14  narrowly construed.  The exceptions, 1A -- I mean, as to 2A

15  and 2B.  Defense relies upon Juror No. 6 bringing into the

16  jury deliberation room the definitions as asserted in the

17  affidavits.

18         Well, the problem is, there's no prejudice to the

19  defendant from the juror doing that.  No. 1, I have no idea

20  when it happened.  There's no evidence before me that it

21  happened before the verdict on Count No. 3.

22         No. 2, those words had no relationship whatsoever to

23  the law that governed the decision in Count 3.

24         Then we get to the *Peña-Rodriguez* constitutional

25  exception to the anti-impeachment rules.  It's a very narrow

1  exception.  The Supreme Court took great pains to say it's a

2  very narrow exception and it applies only in instances where a

3  juror expresses that the vote for guilty was based on race and

4  racism.  The defendant, and I understand why they're doing

5  this, needs to expand that, to include any kind of racial

6  interference or influence on a verdict.

7       But the fact remains that none of the affidavits,

8  none of the evidence before this Court indicates that anyone

9  -- remember, it took 12 people to vote guilty, that anyone

10  voted for guilty because of the race of the defendant.

11       Racism is, according to the Third Circuit, an

12  internal, not an external matter.  And this applies also to

13  the exceptions A and B, that and that's *U.S. versus Shalhout*,

14  S-H-A-L-H-O-U-T case.  It's a non-precedential Third Circuit

15  opinion.  It's reported at 507 Federal Appendix 201.  Now,

16  this preceded the *Peña-Rodriguez* case, but I think it's still

17  good law for the proposition that expressions -- racist

18  expressions during deliberations by a juror is an internal

19  matter.  It's only when the evidence shows that the racism and

20  the race of the defendant was what caused the conviction that

21  the Court can inquire to ensure that the conviction was not

22  based on racism.

23       So I think *Shalhout* is still good law for the

24  proposition that it's an internal and not external influence

25  on the jury.

1       No Court has extended *Peña-Rodriguez* in the way that

2  the defendant seeks.  In fact, decided cases so far have

3  rejected extension of *Peña-Rodriguez* to those situations.

4       Let me just say that given the nature of the charges

5  in this case, given the nature of the evidence in this case,

6  nobody should be surprised that the discussions of this jury

7  or any jury focused on race.  That's what this case was all

8  about and will continue to be all about, was race.

9       As to the Facebook post, I think it's innocuous.  We

10  had this discussion, Mr. Cipparone and I, about it.  She

11  clearly, in her Facebook post, indicates frustration with

12  violence against women.  To me, it's rather innocuous.  Who

13  doesn't?  And who hasn't expressed frustration with the

14  violence against women?  Everyone should.  Does that make you

15  automatically an unfair juror?  Does that make you

16  automatically someone who has lied to us in voir dire?

17  Absolutely not.  She's a human being.  There's never been a

18  court that said that no juror could bring human experience

19  into the process of deliberation.  I won't be the first.

20       Consequently, the motion to set aside the verdict

21  will be denied.

22       Now, I'm given to understand that there's an

23  application to postpone the sentencing.  I'll hear from you.

24       MS. LORBER:  So, Your Honor, the issue is that we

25  just don't have a final presentence investigation report yet

1

1           **UNITED STATES DISTRICT COURT**
         **FOR THE DISTRICT OF NEW JERSEY**
2 _____

3 UNITED STATES OF AMERICA,        CRIMINAL NUMBER:

4          v.               17-532

5 FRANK NUCERA, JR.,          SENTENCING

6        Defendant.
   _____

7      Mitchell H. Cohen Building & U.S. Courthouse
     4th & Cooper Streets
8      Camden, New Jersey  08101
     May 26, 2021
9

10 **B E F O R E:**          **THE HONORABLE ROBERT B. KUGLER,**
                    **SENIOR UNITED STATES DISTRICT JUDGE**
11

**A P P E A R A N C E S:**
12

     OFFICE OF THE UNITED STATES ATTORNEY
13      BY: MOLLY S. LORBER
        R. JOSEPH GRIBKO
14      ASST. UNITED STATES ATTORNEYS
     FOR THE GOVERNMENT
15

16      ROCCO C. CIPPARONE, JR., ESQUIRE
     203-205 BLACK HORSE PIKE
17      HADDON HEIGHTS, NEW JERSEY 08035
     FOR THE DEFENDANT
18

19

20

21

22

23         Carl J. Nami, Official Court Reporter
          Carl_Nami@NJD.USCOURTS.GOV
24              609-439-5420
  Proceedings recorded by mechanical stenography; transcript
25       produced by computer-aided transcription.

A.23

```
 1              (Defendant Present)
          (The following took place in open Court)
 2

 3       THE DEPUTY COURT CLERK:  All rise.

 4       THE COURT:  Thank you.  Have a seat, please.  All
 5  right.  The basic ground rules.  Keep your masks on unless
 6  you're speaking and maintain your distancing, please.  And,
 7  third, but probably more important or most important is the
 8  acoustics are terrible because of this Plexiglass, Mr. Nami
 9  needs to hear everything you say.  If he cannot understand
10  you, he will tell you and ask you to repeat yourself.  So
11  please go slowly and speak with some distinction so he can
12  hear and understand you.

13       All right, let's start with the appearance of counsel.
14  For the government, please.

15       MS. LORBER:  Good afternoon, Your Honor.  Assistant
16  United States Attorney Molly Lorber on behalf of the
17  government.  And also on behalf of the government, Assistant
18  United States attorney Joseph Gribko.

19       MR. GRIBKO:  Good afternoon, your Honor.

20       THE COURT:  Good afternoon.  Mr. Cipparone.

21       MR. CIPPARONE:  Good afternoon, your Honor.  I'm glad
22  you looked at me for slowly but not distinctly.  I'll try to
23  do both.  Rocco Cipparone on behalf of Mr. Nucera.

24       THE COURT:  All right.  Now, Mr. Cipparone, have you
25  had enough time to go over the Presentence Investigation
```

00:01 (line 5)
00:01 (line 10)
00:01 (line 15)
00:02 (line 20)
00:02 (line 25)

1    Report with your client?

2         MR. CIPPARONE:  Yes, your Honor.

3         THE COURT:  I know there's an objection to the

4    offense level which we will get into directly.  Other than

00:02    5    that, any objections?

6         MR. CIPPARONE:  There are non-Guideline corrections I

7    should say, Judge, a number of them that are addressed in my

8    sentencing memorandum, but I can summarize them if you'd like.

9         THE COURT:  When do you want to go through them?  I

00:02    10   mean we might as well get them corrected now.

11        MR. CIPPARONE:  I think that's a good idea, your

12   Honor.  Thank you, Judge.

13        THE COURT:  Go ahead.

14        MR. CIPPARONE:  Paragraph 16.  Paragraph 16, footnote

00:02    15   5.  I think there's simply, a I guess I'll call it a

16   typographical error where it says the defendant does not

17   state, that should be Mr. Stroy does not state.  I think the

18   statement is attributable to Mr. Nucera incorrectly.

19        THE COURT:  All right.

00:03    20        MS. LORBER:  Your Honor, I would just ask that we

21   refer to the victim through as a civilian one since that's how

22   you refer to.  Just a little confusing.  I have no problem

23   with the correction if we could consistently use civilian one.

24        THE COURT:  Okay, civilian one we call it.

00:03    25        All right next.

|  |  |  |
|---|---|---|
|  | 1 | MR. CIPPARONE:  Paragraph 46, there are -- that's Mr. |
|  | 2 | Nucera's physical condition.  I think it needs to be updated |
|  | 3 | to indicate that in 2020 he had shoulder surgery to repair a |
|  | 4 | bicep muscle that was torn or detached from the bone which |
| 00:03 | 5 | gives him limited mobility affecting his ability to perform |
|  | 6 | certain physical activities.  And as your Honor knows from the |
|  | 7 | hearing last Monday, that he is suffering from long-term |
|  | 8 | complications from Covid, including blood clots in his lungs |
|  | 9 | and legs. |
| 00:04 | 10 | THE COURT:  Okay, ask Probation if they can beef that |
|  | 11 | up with this information, please?  Thank you.  Go ahead. |
|  | 12 | MR. CIPPARONE:  Paragraph 54, your Honor.  That's the |
|  | 13 | section that relates to employment.  When it was written it |
|  | 14 | was accurate that Mr. Nucera was employed by UPS, but he is no |
| 00:04 | 15 | longer employed.  That was a seasonal position and also |
|  | 16 | because of the physical limitations that he suffered from the |
|  | 17 | car accident and currently from the Covid he is not capable of |
|  | 18 | that kind of employment. |
|  | 19 | THE COURT:  Okay, ask Probation to add that, please, |
| 00:04 | 20 | to 54. |
|  | 21 | MR. CIPPARONE:  The next is paragraph 56, your Honor, |
|  | 22 | that begins on page 11.  That's a kind of lengthier paragraph |
|  | 23 | that goes through Mr. Nucera's financial conditions.  So there |
|  | 24 | are a couple of updates to that.  On page 12, it indicates |
| 00:04 | 25 | again that there are earnings from UPS.  That's no longer the |

<table>
<tr><td></td><td>1</td><td>case.  So he has no current income.  As a result of that, the</td></tr>
<tr><td></td><td>2</td><td>total monthly income reflected on page 12 should be $7,999.26,</td></tr>
<tr><td></td><td>3</td><td>which is primarily his wife's income rather than the currently</td></tr>
<tr><td></td><td>4</td><td>stated 11,223 and change.</td></tr>
</table>

00:05    **5**      THE COURT:  Reflect that, too, please, Mr. DeRosa.

**6**      MR. CIPPARONE:  There's also a mortgage that is

**7** listed in the liability section but not in the monthly

**8** expenses section.  There's -- that's approximately $900 per

**9** month.  It varies slightly when the rate changes because it's

00:05    **10** a variable rate.  But because that's not included in the

**11** monthly expenses, they are a little bit shy, and so it should

**12** be $9,791.47 for the monthly expenses.

**13**      THE COURT:  And this is the mortgage on the rental

**14** property or the home?

00:05    **15**      MR. CIPPARONE:  This is the mortgage on the rental

**16** property.

**17**      THE COURT:  Got it.  Okay.

**18**      MR. CIPPARONE:  And finally with respect to that

**19** larger paragraph 56, the total monthly cash flow on page 13

00:06    **20** should be reduced from 2331 and 79 cents to a negative 1792

**21** and 21 cents.  When you incorporate those other changes I just

**22** referenced, Judge, it brings the cash to negative.

**23**      THE COURT:  Let's please amend the amount in the

**24** presentence report to reflect that.  Anything else?

00:06    **25**      MR. CIPPARONE:  In terms of non-Guideline objections,

1  no, your Honor.

2       THE COURT:  All right.  Does the government have any

3  objections to the presentence report?

4       MS. LORBER:  No, your Honor.

00:06  5       THE COURT:  All right.  I wanted to make sure that I

6  understood one thing, however.  You argue in your brief about

7  an offense level of 23, but do I understand correctly you're

8  not seeking an upward departure?  You're seeking just that to

9  illustrate an upward variance.  Correct?

00:06  10       MS. LORBER:  Yes, your Honor, that's correct.  We're

11  not seeking any upward departures, only a variance for the

12  reasons spelled out in our sentencing memorandum.

13       THE COURT:  All right.  All right, well let's talk

14  about the offense level.  The Probation Officer has calculated

00:07  15  in the PSR an offense level of 12 which would with a criminal

16  history category of one because there is no criminal record,

17  yielding a recommended sentence of 10 to 16 months.  I think

18  the government concurs in that, but, Mr. Cipparone, you

19  object.  So I'll hear you.

00:07  20       MR. CIPPARONE:  Thank you, your Honor.  I've set this

21  out obviously as your Honor knows what I hope was a

22  comprehensive sentencing memo.  I'll rely on that, but I will

23  summarize and a little bit of some of those objections.  If I

24  caught all the relevant paragraphs right, I think the

00:07  25  objections pertain to paragraphs 24, 26, 27 and 60 of the

|  |  |  |
|---|---|---|
| | 1 | report meaning those are the portions that would be affected |
| | 2 | if my position is correct.  And so I submit that the base |
| | 3 | offense level should be six, the total offense level should be |
| | 4 | six and the guideline range, therefore, should be zero to six |
| 00:08 | 5 | months.  The first objection that affects that, your Honor, is |
| | 6 | primarily the only objection that affects, that is the conduct |
| | 7 | alleged in Count three of the indictment it was in a count of |
| | 8 | which Mr. Nucera was convicted does not establish the crime |
| | 9 | that the government contends and the Probation Department |
| 00:08 | 10 | contends is covered by Section 2H1.1.  That's the cross |
| | 11 | reference section in which the government seeks its variance |
| | 12 | or enhanced sentence and the application of higher Guideline |
| | 13 | range.  And as the Court and I cited this to your Honor, I |
| | 14 | think I'm pronouncing it correctly Bah, B-a-h, Court the |
| 00:08 | 15 | correctly set out that the unambiguous language of Section |
| | 16 | 2B1.1 where it's talking about the cross reference is that |
| | 17 | establishes that the District Court may only look at the |
| | 18 | conduct set forth in the count of conviction when determining |
| | 19 | whether the cross reference applies.  As such this cross |
| 00:09 | 20 | reference is applicable only if the conduct alleged in the |
| | 21 | count of indictment of which the defendant is convicted |
| | 22 | establishes the elements of another offense.  And there are |
| | 23 | other cases cited in the brief, your Honor.  Garcia and Gano |
| | 24 | G-a-n-o that support that proposition as well.  Your Honor |
| 00:09 | 25 | will recollect obviously from the jury instructions as well as |

1  Count three of the indictment that there were four alleged

2  statements that the jury was given to consider as to whether

3  or not Mr. Nucera made a false statement to the FBI in

4  violation of Section 1001.  The first question was:  But you

00:09   5  didn't go hands on with anybody?  Answer:  Nope, nope, I

6  didn't go hands on, didn't touch anybody, didn't spray

7  anybody.  I know your Honor read this, I won't read all four

8  to your Honor.  I'll make the argument.

9       So with respect to Count one, right, it's either -- go

00:10  10  to the cross reference Section in the 2H Section, either the

11  elements of Count one or Count two of which the jury was not

12  able to reach a verdict have to be established by the

13  allegations of Count three in order for the cross reference to

14  apply is my position.

00:10  15       THE COURT:  But the government points out that Count

16  three in the indictment says that, alleges that the statements

17  were false because he knew he had slammed the victim's head

18  into a door jam during the arrest when the victim hadn't been

19  restrained and handcuffed.  It's alleged then proof beyond a

00:10  20  reasonable doubt.  Correct?

21       MR. CIPPARONE:  I don't agree respectfully your Honor

22  that it is proof beyond a reasonable doubt.  The elements of

23  Count one and Count two are proved by that conviction, for a

24  number of reasons.  One, more generally those four statements

00:10  25  -- we have no special verdict form with respect to those four

1   statements.  So we don't know on which of those four

2   statements the jury was unanimous as to Mr. Nucera's false

3   statement.  Right.  So depending on which of those four

4   statements the jury found there are differences in the way

00:11   5   these elements can be assessed.  But if when you look at count

6   one and the elements more importantly that were set forth

7   properly in your Honor's jury instructions, it had -- to be

8   guilty of that, the defendant had to have caused bodily injury

9   to Timothy Stroy.  Or victim one.  I may have slipped on that,

00:11   10   Judge.  I'll try not to.  But his name is out there.  I'm not

11   trying to be flippant, I'm just -- use the same name.  There's

12   nothing in the allegations contained in count 3 that, that

13   allege that Mr. Nucera caused bodily injury to Mr. Stroy,

14   including in the statement which your Honor just read a moment

00:11   15   ago.  So that element is not conclusively established by the

16   jury's verdict with respect to Count three.

17       The second element is that the defendant did so because

18   of the actual or perceived race or color of Timothy Stroy.

19   Again, those four statements do not establish that basis that

00:12   20   it was, that if there was contact, it was based on race.  And

21   the third that the defendant Mr. Nucera did it knowingly and

22   wilfully.  Again, there can be a false statement that says I

23   didn't touch him, but that didn't happen to intentional

24   touching.  It's not inherent in the jury's verdict.

00:12   25       So with respect to that count, Count one, it's not

1    subsumed within in count three.  It was not proof of bodily

2    injury.  It's not proof of the race motivation, and there's no

3    mental state referenced in any of those allegations in Count

4    three regarding Mr. Nucera's alleged touching of Mr. -- of

00:12    5    Civilian One.

6         If I move on to count two as the underlying cross

7    reference count, the three elements require again as properly

8    set forth in your Honor's jury instructions that Mr. Nucera

9    acted under Color of Law while using or misusing power

00:12   10    possessed by reason of his official position.  That element is

11    not established by the jury finding, for example, that Mr.

12    Nucera falsely stated I never touched him.  You can touch

13    someone without misusing your power or abuse of your official

14    position.  It can still be a false statement.  So, again,

00:13   15    element one of Count two is not established by that verdict.

16    Second the right to be free from the use of unreasonable and

17    excessive force.  Again, the touching the jury could have

18    found of those four statements does not inherently establish

19    that the force or the touching was excessive or unreasonable.

00:13   20    It simply establishes that there was a false statement from

21    the jury's perspective that Mr. Nucera ever touched Mr. Stroy.

22         And then the last one I've already addressed with

23    respect to Count one.  The defendant acted wilfully.

24         So again that cross reference doesn't apply because it

00:13   25    does not, as the court has interpreted it and as the

1 application notes make clear establish the cross reference

2 offense either in Count one or Count 2.  I've also made an

3 argument and I'll just incorporate that by reference, your

4 Honor, that the cross reference is only applicable when the

00:14   5 more serious crime sought to be used for the Guideline

6 calculations is also a fraudulent or false statement crime and

7 here is used in Count 1 and 2 are not, unless your Honor wants

8 to me argue that.

9          THE COURT:  The cross reference provision subsection

00:14   10 3 is not restricted to financial or fraudulent crime.  It

11 doesn't say that.  It just says the conduct set forth in the

12 count of conviction establishes an offense specifically

13 covered by another Guideline in Chapter two.  There is another

14 guideline that specifically covers depravation of rights.

00:14   15 Correct?

16          MR. CIPPARONE:  I don't disagree with the latter part

17 of your Honor's statement.  Obviously I don't concede the

18 position that the Guideline is intended to cover more than, in

19 the cross reference more than fraudulent or false statement

00:15   20 conduct but --

21          THE COURT:  In the Government's supplemental

22 memorandum on the disparity issue, the Carpenter case, the

23 Brezna case, this covers the cross reference in the Carpenter

24 case was used.  The Court of Appeals didn't comment on it, but

00:15   25 it was used by the sentencing Judge.  Correct?

1     MR. CIPPARONE:  Yes, but I think that's the critical

2 distinction your Honor just put your finger on which is the

3 Court of Appeals didn't comment on it.  And as your Honor

4 knows as a Judge and as the Court of Appeals is, you know,

00:15   5 probably in your opinion and I don't mean it in the negative

6 sense, you don't decide issues that aren't presented to you.

7 And that's where you get, you know, you open up cans of warms.

8 And so that's -- the Carpenter case on which the government

9 relies did not address that whole issue.  They said there the

00:15   10 defendant claimed that the sentence that was imposed was

11 unreasonable.  So it was a completely different analysis.  So

12 I don't think the Carpenter case in any way controls this and

13 I don't think --

14     THE COURT:  Well, it's not binding.

00:15   15     MR. CIPPARONE:  Well, it's a different Circuit.

16     THE COURT:  Number one.  And --

17     MR. CIPPARONE:  I guess meaning -- I do even -- I

18 submit it's not even instructive because the Court didn't, did

19 not at all address that issue.  We have no indication whether

00:16   20 or not the Court even considered that issue at the Appellate

21 level.  And to infer otherwise it doesn't jump out at me from

22 the page of the Carpenter I would say.  So I don't think

23 Carpenter is instructive for those reasons, your Honor.

24     So those -- that's the sum of the Guideline objection

00:16   25 from the application of the cross reference.  I hopefully was

1    more articulate than that in my papers.  And again I

2    incorporate those.  But if your Honor has further questions,

3    I'm happy to answer them.

4         THE COURT:  I don't have any questions.  I want to

00:16    5    hear from Miss Lorber though.  Those are important points.

6         MS. LORBER:  With respect to the defense's first

7    argument.  The cross reference in 2B1.1, cross reference

8    reference 2B1.1C3.  3BC states that we're to use the cross

9    reference if the conduct set forth in the count of conviction

00:17    10   establishes an offense specifically covered by another

11   Guideline in Chapter two.

12        Respectfully, it's our position that the defense is

13   reading the count of conviction too narrowly.  As your Honor

14   pointed out, the count 3 of conviction, Count three of the

00:17    15   indictment is not limited to only the four statements that the

16   Government alleges and the jury found were false.  Count three

17   of the indictment in its entirety, first of all the first

18   paragraph of it states that the allegations set forth in

19   paragraphs one through 9 of this indictment are hereby

00:17    20   repeatedly alleged and incorporated as it fully sets forth

21   herein.  And that's where the entire stream of events

22   regarding the arrest of Civilian One one was set forth in the

23   allegations that the defendant struck the handcuffed Civilian

24   One.  And, additionally, in paragraph 16 of Count 3 of the

00:18    25   indictment the Government alleges defendant Nucera's

*United States District Court*
*Camden, New Jersey*

**A.35**

1  statements and representations set forth in bold in paragraph

2  15 of this indictment were false because as defendant then

3  Nucera knew he had slammed Civilian One's head into a door jam

4  during the September 1st, 2016 arrest of Civilian One after

00:18  5  Civilian One had been restrained and handcuffed by other

6  officers.

7          So the Government, it's the government's position, your

8  Honor, that that conduct alleged in Count 3 of the indictment

9  when Count 3 is read in its entirety does, in fact, set forth

00:18  10  and meets the elements of at least a Section 242 violation

11  justifying the cross reference to the 2H1.1 Guideline, the

12  Civil Rights violation Guideline.  And certainly we have, and

13  I won't belabor the point because I do set it out in my

14  sentencing memo, but we alleged that Nucera was Chief of the

00:19  15  Bordentown Township Police Department on that date and came to

16  the scene of Civilian One's arrest in his official capacity.

17  That he was interviewed by a Special Agent of the FBI

18  regarding Civilian One'S arrest on December 22, 2016, and

19  falsely stated multiple times that he didn't touch Civilian

00:19  20  One during the arrest.  And his statements were false because

21  as defendant Nucera then and there knew he had slammed

22  Civilian One's head into the door jam while he was handcuffed

23  and restrained.  Thus Nucera did knowingly and wilfully make

24  materially false, fictitious and fraudulent statements and

00:20  25  representations in a manner within the jurisdiction and

1  Executive Branch of the government of the United States,

2  namely a criminal investigation conducted by the United States

3  Department of Justice.

4      So, your Honor, we would argue that if we read the

00:20   5  indictment Count 3 in its entirety, it certainly sets forth

6  conduct which is a violation of 18 U.S.C., Section 242 and

7  certainly it's the Government's position that we proved that

8  conduct at trial certainly at least by a preponderance of the

9  evidence.  Since we're here at sentencing now, the standard is

00:20   10  not beyond a reasonable doubt.  The case law instructs that

11  the cross reference applies so long as the government has

12  established that conduct by a preponderance of the evidence.

13  We submit we have.

14      THE COURT:  Thank you.  Any response, Mr. Cipparone?

00:20   15      MR. CIPPARONE:  No, your Honor.  Thank you.

16      THE COURT:  All right.  Of those of you who are not

17  immersed in the complexities in the Sentencing Guidelines.

18  Let me try to explain what we're all talking about in as plain

19  as English as I can get.  The Sentencing Guidelines are

00:21   20  designed to give the Court and the parties some background and

21  some guidance on what the appropriate sentence would be.  By

22  definition, it cannot and does not encompass every single

23  Federal crime.  It would be impossible to do so.  There are so

24  many Federal crimes.  So there are provisions of the

00:21   25  Guidelines but they're very general, such as this is and what

1   is very general is what we're calling a cross reference.  It

2   says in essence if there's a more specific Guideline, you may

3   use that.  And the question here is whether the more specific

4   Guideline directed to a violation of rights is applicable from

00:21   5   the general reference or cross reference from this Guideline.

6   And that's what we're talking about.  There is very little law

7   on this subject.  Apparently has not come up very often on

8   this specific cross reference.  So anyway.

9        Here's what I find in this.  The Guideline we're

00:22   10   talking about 2b1.1, C3 is unambiguous and the Supreme Court

11   has told us just as recently as two years ago, if the

12   Guideline is unambiguous, there is no need or requirement to

13   consult any of the application notes.  I don't think there's

14   anything unambiguous about this.  It says the conduct set

00:22   15   forth in the count of conviction establishes an offense

16   specifically covered by another Guideline in Chapter 2.  If

17   so, apply that other Guideline.  So clearly there is a

18   Guideline in Chapter 2 which covers more specifically the acts

19   by the defendant.  The defendant's argument is, well, I wasn't

00:23   20   convicted of those acts and, therefore, we cannot use that

21   Guideline.  However, I do believe that the Government is

22   correct.  The count convicted, he was convicted of does

23   encompass these acts because it specifically refers to the

24   incident in which he slammed the victim's head into the door

00:23   25   jam during the arrest after the victim had been restrained and

1    handcuffed.  I do believe the jury has found that that

2    happened through operation of Count 3 and if not, I would find

3    by a preponderance of the evidence that the defendant did

4    violate the Civil Rights and the Civil Rights Statute in the

00:24    5    actions that day.  He was the Police chief, therefore he was

6    clearly operating Under Color of Law.  He subjected the victim

7    to the depravation of his Fourth Amendment right to be free

8    from excessive force by slamming his head immediately into the

9    door jam, and he did so willfully, I might add maliciously

00:24    10    because his motivation was racism.

11    Therefore, I overrule the objection.  I do find the

12    offense level is as specified by Probation to start at six.

13    And that leads to Paragraph 27 because Probation adds another

14    six points under the operation of 2H1.1b1.  Is there an

00:25    15    objection to that, Mr. Cipparone?

16    MR. CIPPARONE:  Yes, your Honor, for the same reasons

17    I previously stated.

18    THE COURT:  Well, one is dependent on the other.

19    MR. CIPPARONE:  Yes.

00:25    20    THE COURT:  That's for sure.  Well, clearly I assume

21    that I'm correct, that the first one he qualifies for the six

22    level increase under 2H 1.1 B1 but because he was a public

23    official and because he committed the depravation of rights

24    under Color of Law because he was the Chief of police.  Having

00:25    25    found that, let me remind you and everyone that that's not the

|        |    |                                                                           |
|--------|----|---------------------------------------------------------------------------|
|        | 1  | end of the analysis that I must go through.  The sentence that            |
|        | 2  | I'm going to impose in this case is not dependent upon the                |
|        | 3  | Guideline.  This case is going to be driven by the factors                |
|        | 4  | under 3553(a) which we will get to directly.  Now, either side           |
| 00:26  | 5  | has any upward or downward departures.  Correct?                          |
|        | 6  | Mr. Cipparone?                                                            |
|        | 7  | MR. CIPPARONE:  Correct, your Honor.                                      |
|        | 8  | THE COURT:  The government already indicated it has                       |
|        | 9  | no upward or downward departure.  And my practice is to give             |
| 00:26  | 10 | the defendant the last word.  So we'll hear from the                     |
|        | 11 | government now, the third stage of this proceeding which is              |
|        | 12 | the discussion of the 3553(a) factors as set forth by Congress          |
|        | 13 | in that statute.  Miss Lorber.                                           |
|        | 14 | MS. LORBER:  Thank you, your Honor.  As your Honor is                    |
| 00:26  | 15 | aware, the Court must consider a number of factors under 18              |
|        | 16 | USC, Section 3553 when imposing sentence.  First, I would                |
|        | 17 | direct your Honor's attention to the seriousness of the                  |
|        | 18 | offense.  Nucera not only lied to the FBI, he did so as a                |
|        | 19 | sitting Police Chief, and he did so where he lied to the FBI             |
| 00:27  | 20 | in an attempt to obstruct their investigation of a Civil                 |
|        | 21 | Rights offense that the Government has proved by a                        |
|        | 22 | preponderance of the evidence, at least he committed.  The              |
|        | 23 | defendant Nucera's actions undermines public confidence in law          |
|        | 24 | enforcement, and that certainly is a relevant factor here.              |
| 00:27  | 25 | And Nucera was not only responsible for complying with the              |

1  United States Constitution and the New Jersey Attorney

2  General's Use of Force Guidelines himself, he was responsible

3  as Chief of Police for ensuring that every single officer in

4  his Department followed those same Use of Force Guidelines.

00:28   5  So for him to have not only violated those Guidelines, but

6  then as a sitting Police Chief lied to the FBI about his own

7  conduct is quite a serious offense.  It sends a message that

8  lying and obstructing the Civil Rights investigations is

9  something that's okay.  Is something that police officers

00:28   10  should feel free to do, when that is, of course, not the case.

11      The nature and circumstances of the offense also calls

12  for a sentence above the advisory Guidelines range of 10 to

13  16 months.  Not only did Nucera strike a handcuffed detainee

14  and then lied to the FBI about it, he did so because that

00:29   15  detainee was African American.  And we know that he was

16  motivated, at least in large part, by Civilian One's race

17  because he said so in his own words back at the station house,

18  within hours if not one hour after the incident.  Defendant

19  Nucera was recorded in referring to Civilian One by the N

00:29   20  word.  Wishing allowed that one of his subordinate officers

21  could have brought his dog to the scene and unleashed the dog

22  on Civilian One and his 16-year old friend who was with him,

23  Civilian 2 and saying that if the officer had unleashed his

24  dog on the two unarmed African American teenagers quote:

00:30   25  You'd have seen him F'n N word stop dead in their tracks.  And

1   in doing so, he made barking noises and laughed.

2        So, this is not a situation where this was a one off

3   slip of the tongue.  This was clear the manner in which this

4   defendant was accustomed to thinking about the African

00:30   5   American civilians who it was his duty to serve and protect as

6   a police chief and had no trouble referring to the unarmed

7   teenagers in that abhorrent way while on duty to a subordinate

8   officer.  So, clearly he was racially motivated by racial bias

9   in striking the handcuffed unarmed teenager.

00:31   10       The history and characteristics of the defendant also

11   calls for a sentence above the advisory Guidelines range.  Uh,

12   Nucera's assault on Civilian One, the victim lied to the FBI

13   about his conduct is not just an isolated incident.  And my

14   opposing counsel does, as always, a very fine job in his brief

00:31   15   of painting a sympathetic picture of his client, and that is

16   to Mr. Cipparone's credit.  He submits numerous character

17   references.  Lots of information about the good works that the

18   defendant did in his capacity as a police officer, then Police

19   Chief and also Township Administrator.  But the government

00:32   20   would point out that it was defendant Nucera's position of

21   power, including his position as Township Administrator, his

22   position as Police Chief, that he had abused when he committed

23   the crime of which he's been convicted.  Lying to the FBI and

24   also the underlying assault and violation of civil rights

00:32   25   which the Government has proved by at least a preponderance of

1  the evidence here.  And so, undoubtedly, the defendant has

2  done good things in his life, but he also had a pattern and a

3  practice as Police Chief of instructing those that worked for

4  him that it was okay to intimidate African American civilians

00:33   5  at high school basketball games with police dogs, to health

6  police dogs personally intimidate African American civilians

7  in apartment complexes.  And so while certainly the Court can

8  and should take into account the defendant's public service,

9  the Court should also be mindful of the fact that he abused

00:33   10  those positions of power that the public intrusted to him.

11      Additionally, a sentence above the Advisory Guideline

12  range is really needed to afford adequate deterrence to

13  criminal conduct here.  Nucera himself is retired.  He's not

14  going to work in law enforcement again, but it's very

00:34   15  important that other police officers see that this kind of

16  conduct is not going to be tolerated.  It is very important

17  that the community and other would be defendants see that

18  valuing the safety and the civil rights of African American

19  community members any less than their right counterparts is

00:34   20  unacceptable.  And that lying to the FBI when the FBI is in

21  the process of investigating civil rights violations is

22  unacceptable and will not be tolerated.  Equally as important

23  there were officers in defendant Nucera's own Department who

24  came forward, brought the misconduct to the attention of the

00:35   25  FBI and testified at trial in this matter.  It would send a

1  terrible message to those officers and to have the opposite of

2  a deterrent effect to other would be offenders if this court

3  were to impose a lenient sentence on defendant Nucera.  Police

4  officers who take the difficult steps as Sergeant Roar did in

00:35  5  this case and Sergeant Guido of reporting misconduct on the

6  part of not only a fellow officer but a superior officer is

7  not to be made to feel that the difficult step that they take,

8  the price they know that they potentially could pay by

9  damaging their own careers in reporting a fellow officer, they

00:36  10  should not feel that that effort is in vain or will be blown

11  off by the criminal justice system.  Those officers should

12  feel secure that if they report misconduct on the part of a

13  fellow officer and a superior officer, the legal system is

14  going to take that misconduct and those allegations seriously.

00:36  15  From the government's sentencing memorandum, we also addressed

16  by analogy some other basis for an upward variance.  And as

17  your Honor noted at the outset of the sentencing proceedings,

18  I refer to, I refer to by reference, for example, U. S.

19  Sentence guideline 5(k)2.7, policy statements disruption of

00:37  20  governmental functions.

21       Now I'm not arguing that we -- we're certainly not

22  seeking an upward variance and we're not trying to say that

23  all, that all the necessary proofs have been made to establish

24  by a preponderance of the evidence that that upward departure

00:37  25  would apply.  What I am saying is that the Guidelines

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | certainly recognize that where someone is convicted of a crime       |
|       | 2  | and that crime represents a disruption of governmental               |
|       | 3  | function, it's a factor that your Honor can consider and             |
|       | 4  | should consider when deciding whether to upwardly vary here.         |
| 00:37 | 5  | And, and as you know because this defendant was not just a           |
|       | 6  | line officer which would have been bad enough because he was         |
|       | 7  | the chief of police, the Government is arguing that that's           |
|       | 8  | worthy of additional consideration of the damage to police          |
|       | 9  | community relations that that did.  The disruption to the            |
| 00:38 | 10 | police department that that had is worth considering.                |
|       | 11 | Additionally, as your Honor has noted and as I've noted              |
|       | 12 | the racial bias motivation here is a significant factor.             |
|       | 13 | Again because the crime of conviction here is a thousand and         |
|       | 14 | one false statements to the FBI.  That's not a victim crime.         |
| 00:38 | 15 | We don't have a convict of that crime.  However, certainly           |
|       | 16 | we've proved by a preponderance of the evidence that the             |
|       | 17 | defendant was motivated to strike Civilian One because of            |
|       | 18 | Civilian One's race and the Guidelines recognize that where          |
|       | 19 | that is the case, additional punishment is warranted.  So I          |
| 00:39 | 20 | would say that that is a basis for an additional upward              |
|       | 21 | variance.                                                             |
|       | 22 | And finally, your Honor, I would just, I would just                  |
|       | 23 | request that when your Honor, if your Honor finds that an            |
|       | 24 | upward variance is appropriate?  The Government is seeking an        |
| 00:39 | 25 | eleven level upward variance all the way to up to an offense         |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | level of 23 which would give us a new Guidelines range of 46         |
|       | 2  | to 57 months.  The government thinks that in light of all the        |
|       | 3  | conduct that we've discussed today, a sentence in that range         |
|       | 4  | would be appropriate.  Should the court agree with the               |
| 00:39 | 5  | Government that an upward variance is appropriate here, we           |
|       | 6  | would just ask that you state exactly your reasons on the            |
|       | 7  | record for that upward variance.  And if your Honor agrees           |
|       | 8  | that your Honor would have imposed that sentence under the           |
|       | 9  | 3553A factors whether the cross reference was applied or not.        |
| 00:40 | 10 | The government would ask that you say so when you state your         |
|       | 11 | reasons just so that the Appeals Court has a full record in          |
|       | 12 | that regard.  Thank you.                                             |
|       | 13 | THE COURT:  Thank you.  Mr. Cipparone?                               |
|       | 14 | MR. CIPPARONE:  Thank you, Your Honor.                               |
| 00:40 | 15 | THE COURT:  And then your client if he wants to                      |
|       | 16 | speak, if he has people he wants to have speak, that's fine,         |
|       | 17 | too.                                                                 |
|       | 18 | MR. CIPPARONE:  I do have some people that want to                   |
|       | 19 | speak, your Honor.  I want to address Mr. Nucera's right to          |
| 00:40 | 20 | speak or not at sentencing.  As your Honor knows for a couple        |
|       | 21 | of reasons, he's not going to speak today.  There are two main       |
|       | 22 | reasons for that, frankly.  One is because of his medical            |
|       | 23 | condition.  He does have a very difficult time and I think I         |
|       | 24 | told the Court this on Monday even getting a breath out and          |
| 00:40 | 25 | the words out in any sustained way.  I've had a very hard time       |

1  speaking with him.  And, two, frankly is primarily my advice

2  for the reason that he is facing a retrial and an appeal of

3  the incident conviction and anything he says today whether

4  it's in context, out of context could be sought to be used by

00:41   5  the Government in either the re-trial or on appeal and we are

6  in a somewhat unique circumstance in this sentencing where he

7  is being sentenced on a Count of the indictment where there

8  are still two Counts that have to be re-presented to a jury.

9  So for that reason I, frankly, have given him my advice that

00:41   10  it's because of those risks of what could be said out or taken

11  out of context were used in some context I can't foresee.  I

12  can't adequately predict the nature of whatever he said would

13  not be used against him later even if it were positive.  And I

14  do think what he would say in many respects would be positive,

00:41   15  but I don't want the Court to draw any negative inference from

16  his not speaking because it is based primarily frankly on my

17  advice and his medical condition.

18        THE COURT:  Let me assure you and Mr. Nucera that his

19  exercise of his right not to speak will not in any way be held

00:42   20  against him.  I perfectly understand what you're saying.

21        MR. CIPPARONE:  I appreciate that, your Honor.  Thank

22  you.  I think it would make sense because obviously I'm going

23  to address the 3553A factors which will include what the

24  character witnesses will say.  That maybe I'll have character

00:42   25  witnesses first, and then I'll make my comments if that's okay

1   with your Honor.

2        THE COURT:  Fine.  Who are you going to call first.

3        MR. CIPPARONE:  Norman Hand.  H-a-n-d.

4        THE COURT:  Mr. Hand, you want to come forward?  You

00:42   5   will see a lectern up here between the lawyers.  If you want

6   to come all the way up here between the lawyers, that will be

7   terrific.

8        MR. NORMAN HAND:  Here, your Honor?

9        THE COURT:  Right there.

00:42  10        MR. NORMAN HAND:  Thank you.

11        THE COURT:  Thank you.

12        MR. NORMAN HAND:  Good afternoon, your Honor.

13        THE COURT:  Good afternoon, sir.  Would you tell us

14   your full name?

00:43  15        MR. NORMAN HAND:  Sure.  My name is Norman Hand, and

16   I'm a retired police captain from the Bordentown Township

17   Police Department.  After retiring, I returned to work for the

18   Township in the Construction Office as a Code Enforcement

19   officer, interim zone officer then for last four years I

00:43  20   worked as a clerk in the municipal Court.

21     I would like to speak about the Frank Nucera I know

22   after 23 and a half years.  Frank Nucera started out as my

23   co-worker and became my supervisor and my friend.  I, my wife,

24   my children and even the foster children we were raising at

00:43  25   the time sometimes in the company of Frank and his family.

1   Publicly and privately he was always a gentleman.  He's always

2   been dedicated to the town he grew up and worked in.  Paperboy

3   days and Chief of Police.  He put the residents and members

4   and the ahead of the -- I'm sorry.  I have to backup.  Ahead

00:44   5   of his own needs.  Sorry.  And that was often at the expense

6   of his own personal time with his family.  Frank could be

7   found at the station at all hours of the day.  Would often

8   respond to the station in the middle of the night if he heard

9   the on call shift needed assistance.  He expected the officers

00:44   10   to be squared away and to ensure that the quality of life

11   issues were addressed.  He was committed to the safety and

12   security of businesses as well as the residential communities.

13   He expected officers to be visible to the public.  To get out

14   of the car, to talk with residents, store patrons when they

00:44   15   could during downtime.  To check businesses to make sure that

16   they were secure after hours.  That there were no disabled

17   vehicles on highways with motorists stuck on the side of the

18   road.  And if possible to contact residents who may have

19   inadvertently left the garage door open over night after

00:45   20   retiring.  He gave the community support through the Special

21   Olympics host -- excuse me.  Hosting such public events such

22   as National Night, the Youth Police Academy which was

23   presented by the Burlington County Sheriff's Department.

24   Frank enjoyed seeing kids inside the police vehicles and

00:45   25   hosted tours in the Department for them to get a look inside.

1   He also was able to get firing up the military staff and
2   vehicles to appear at these events to meet and speak with
3   residents and children and setup status displays of vehicles
4   and equipment.  And they would get to see these things up
00:45   5   close as opposed to riding down the road.  He even managed to
6   have the Air National Guard, the New Jersey State Police and
7   the Channel Six Action News helicopter manned some of these
8   events which were usually the favorite of everything.  He
9   supported the schools and programs like Adopt A Cop.  Dare,
00:46   10  great which is a gang awareness program.  The child
11  identification program and provided officers for the high
12  school driver-ed program and detectives for the drug
13  identification lesson, which taught children that they, what
14  they may see on the ground along side the road, may seem
00:46   15  harmless but could be anything but.  He supported uniformed
16  officers that went into the schools at lunch time to assist
17  the cafeteria and eat with kids showing them that police are
18  just people, too.  During the holidays when the schools would
19  call on the children who would not have Thanksgiving due to
00:46   20  financial constraints on the family, he would solicit
21  donations from businesses for turkeys and food if the
22  donations fell shy.  And it was not uncommon that there were
23  times when they could not provide the turkeys, he reached into
24  his own pocket and paid for the food and turkeys.  He's also
00:47   25  given homeless people who were stranded in our town the money

1  out of his pocket to either get to Wendy's or McDonalds to get

2  something to eat or perhaps to take the Light Rail to get back

3  to Trenton or to Camden or whichever city they had come from.

4  He rotated officers in and out of the Mercer County

00:47   5  Prosecutor's Officer for six months to a year at a time so

6  that the officers could learn skills like drug interdiction,

7  crime, investigation techniques and how to prepare a search

8  warrant helping the officers broaden their background.  The

9  practice also provided additional manpower to the County which

00:47   10  also were short on staff there.  Excuse me.  A member of the

11  Veterans Committee attended and hosted the meetings for the

12  Camden County Coalition for Cultural understanding, provided

13  officer representation for the senior citizens and PTA

14  meetings.  He worked with the Rotary.

00:48   15  Frank was respected by many peers and also often asked

16  his opinion on police related matters, and to the best of my

17  knowledge never refused the request for assistance from any

18  law enforcement agency whether it was for equipment, manpower

19  or information.

00:48   20  I have heard it said by some of the peers that Frank

21  Nucera was a cop's cop.  Is Frank Nucera perfect?  Almost by

22  definition man is flawed.  So no he's not perfect.  I don't

23  believe any of us are, but I believe he spent a career doing

24  what he believed to be best served for the community and those

00:48   25  within it.

1    Your Honor, these things that I spoke about except for

2    Frank as a paperboy I have by witness to.  I believe he truly

3    dedicated his life, his time and service for the benefit of

4    all the community.

5    Thank you for your time and your service.

6        THE COURT:  Thank you, sir.

7        MR. CIPPARONE:  Next, your Honor, Mr. Nucera's

8    daughter Christine Nucera would like to address the Court.

9        THE COURT:  Miss Nucera, come forward, please.  Good

10   afternoon, Miss Nucera.  I have your letter but I understand

11   you'd like to say more.  Please do.

12       CHRISTINE NUCERA:  I would.  Although I do understand

13   your verdict, your Honor, I am hoping to provide more insight

14   and to who my father is to so many people.  Please bear with

15   me.  I am not one to have something prepared and to be quite

16   honest, this is not something I've ever thought I'd ever do in

17   my lifetime.  Again, my words showing you who my father is is

18   not only a representation of myself, it is of his wife, his

19   son, his mother, his sister, his brother and his countless

20   grandchildren.  And I don't take this lightly.  Obviously it

21   has been proven that my father was a man of service.  We all

22   know that from his country to his community.  I will say my

23   father loved Bordentown.  He was raised there.  His mother

24   still lives there.  Him and my mom met in that town and grew

25   their family in that town.  And I want to emphasize his love

00:49

00:49

00:50

00:50

00:51

|          |    |                                                                       |
|----------|----|-----------------------------------------------------------------------|
|          | 1  | because as a girl, young girl who grew up in a very small town         |
|          | 2  | with a father in his position that he was, I hated it.  That I         |
|          | 3  | had lived in a small town.  I wanted to go as far away as I            |
|          | 4  | could.  People used to joke when I would say literally my              |
| 00:51    | 5  | entire family lives in that town.  I can get to my aunts.              |
|          | 6  | Anybody could in two minutes.  But I also know that that love          |
|          | 7  | was the complete driving factor and motivation for all of his         |
|          | 8  | efforts in that town.  He cared about the community members.           |
|          | 9  | So many of them were people that he went to school with were           |
| 00:51    | 10 | elderly ladies that he grew up with that were still friendly           |
|          | 11 | with his mom.  His love was nothing but pure genuine.  I want          |
|          | 12 | you to know that.  I want you to know that his commitment to           |
|          | 13 | the Bordentown Township Police Department was of nothing that          |
|          | 14 | I've ever seen from any other officer; not just in that town.          |
| 00:52    | 15 | I can tell you that he would drop anything if something was            |
|          | 16 | going on there and his assistance could benefit the                   |
|          | 17 | Department.  My mother was a nurse.  He was a police officer.          |
|          | 18 | They both did shift work.  I can't tell you the countless              |
|          | 19 | times that my mom was at work, my dad was supposed to be with          |
| 00:52    | 20 | us and something would happen.  I would be baby sat by the             |
|          | 21 | dispatcher.  I grew -- when I tell people I grew up in that            |
|          | 22 | Police Department, I grew up in that Police Department.  I             |
|          | 23 | wondered those halls for hours aimlessly.  I built                     |
|          | 24 | relationships of my own with all of those officers to the             |
| 00:52    | 25 | point that many of them became aunts and uncles my entire             |

1   life.  That we went on family vacations our entire life, that

2   they trusted me to baby sit their kids as I got older.  I tell

3   you that I knew my father at home, but I can tell you I also

4   did know my father inside the walls of that Police Department,

00:53   5   and I find it very troubling that these bonds and

6   relationships would have been built and flourished and

7   maintained like they were had my father not truly been a man

8   of integrity and honesty.  I can tell you that the sacrifices

9   our family endured over the years just became normal.  I will

00:53   10   tell you on family holiday dinners, my dad is a family man.

11   He felt like the officers working deserves to have a meal with

12   a family.  And if their home was too far, they had every

13   Easter, Christmas, Thanksgiving meal with our family and that

14   was just the kind of the norm with us.  But what I will tell

00:53   15   you is that was not only for officers of certain races because

16   that certainly wasn't the case.  I can also tell you how

17   considerate he was for those officers that dinner could be

18   ready and communicate with the officers and we'll be there in

19   ten minutes and they got a call, and we all know what that

00:54   20   life is like.  They got a call and dinner was put on the

21   table, we he would wait an hour, an hour and a half to be

22   seated because what he cared about was them actually eating

23   the meal with us and not eating leftovers.  I can tell you

24   that my father is a family man through and through I cannot

00:54   25   emphasize enough, he is the foundation of our entire family.

|        |    |                                                                          |
|--------|----|--------------------------------------------------------------------------|
|        | 1  | He is the person that everyone counts on for always being one            |
|        | 2  | to help.  He's always reliable.  He sometimes tell you things            |
|        | 3  | you don't want to hear, but he's always looking out for your             |
|        | 4  | best interest.  I can tell you how many people he has helped             |
| 00:55  | 5  | who are not his family.  I can tell you that I have had                   |
|        | 6  | countless friends who didn't have such a strong family life              |
|        | 7  | and that importance at the family dinners and family                     |
|        | 8  | conversations he valued so that he would welcome my friends              |
|        | 9  | into our house.  And not just for an average meal.  Hey, I'll            |
| 00:55  | 10 | make steaks Saturday, why don't you call them over.  Let them            |
|        | 11 | have a good meal.  That didn't depend on their race.  He                 |
|        | 12 | opened his home to countless friends of mine.  He made them              |
|        | 13 | comfortable and enjoyed evening.  I can tell you that my                 |
|        | 14 | father has been a man of structure for my brother and myself.            |
| 00:55  | 15 | I can tell you that that same man has provided more structure            |
|        | 16 | in mine and my son's life that I could never possibly give him           |
|        | 17 | myself.  I can tell you that the same values he instilled in             |
|        | 18 | me and my brother, he's put into that same very little boy.              |
|        | 19 | The fact that a three-year old's favorite movies are Ruddy and           |
| 00:56  | 20 | Hoosiers and things like that, because it's more about the               |
|        | 21 | message.  The fact that he missed countless mile stones and              |
|        | 22 | family times, especially with his older grandchildren, I've              |
|        | 23 | been very fortunate to watch my dad become the primary                   |
|        | 24 | caregiver for my son.  He has had moments with my son that he            |
| 00:56  | 25 | never had with myself or my brother because he was always                |

00:57
00:57
00:57
00:58
00:58

1  working and that he never really some of the older grand kids
2  either.  I see how much each of those grand kids value him
3  independently and how he helps them in their own ways.  I can
4  tell you how much the community events that people speak
5  about, how much they impacted our childhood.  We look forward
6  to them.  It makes me sad that that's not part of my son and
7  my nieces and nephews' lives.  I can also tell you that I'm
8  one who speaks on reforms.  I am the exact result of reforming
9  my entire life.  I was everything father was opposed to for a
10 very long time, opposed to everything that he didn't.  I do
11 believe that things happen for a reason and there is also
12 opportunity to grow.  I will tell you one thing that I
13 struggled with for many years that I never thought I could
14 make amends to my parents for the things that I had done to
15 them, and I held that reservation for a very long time and I
16 still do today.  And through this strategy, it has given me
17 the opportunity to step up and be somebody that I don't think
18 any of us ever thought I would be.  I have had to help
19 physically, whether it is cutting the grass or doing whatever
20 but more emotionally and mentally.  I see myself often
21 breathing hope into my father which is the same thing that he
22 did to me for many years.  I remind him that we can always
23 grow and change.  I have helped through my hands that I have
24 had learned over the course of my transition that our first
25 reaction as humans is usually always wrong.  It is always

00:59

00:59

00:59

01:00

01:00

1  fueled by emotion and the immediate response is not always the
2  response that has the solution.  I can tell you that these
3  lessons that I tried to reflect onto him and I see them in his
4  daily life is not easy and it has been a very mindful process
5  because as you can imagine learning new behaviors is not an
6  easy thing.  As humans we all fail.  We all fail.  I talk
7  about how I failed as a mom all the time.  All the time in
8  speaking in a manner that maybe wasn't intended for my son.
9  I'm exhausted from a long day at work or I'm exhausted from an
10 uncooperative child.  Whatever it may be.  I respond quicker
11 and more emotional than I should sometimes and it's not
12 intentional and I feel remorseful.  Any parent would agree,
13 and I don't think there's a single parent in this courtroom
14 who can say our initial response is not always best, and there
15 is remorse feelings afterwards.  What matters as humans is how
16 we change and move forward and that's the true reflection of
17 who we are.  What we do with that change.  I can tell you that
18 any sentence on my father, put on my father weighs just as
19 heavily on myself and the rest of our family as we come to
20 learn that sometimes others go through the struggles just as
21 much.  I can tell you that for the past four years my father
22 has pretty much lived in isolation.  He has missed every
23 monumental moment, whether it be with myself or my brother or
24 our children.  And he does this to protect those kids, to
25 protect them.  He does not want to make their lives any harder

01:01

01:02

01:02

01:02

01:03

1  and the remorse that he feels.  I can tell you that this

2  sacrifice of him not being present in our moments is the worse

3  sentencing that this man will endure because that will be the

4  rest of his life.  I know that this is in your hands, your

5  Honor, and I do trust.  I know how terrified I am to hear your

6  decision, so I cannot imagine my father's fear.  I know he

7  will accept it gracefully because that is who he is.  That is

8  something that he's always taught us and he's mastered it much

9  better than I have.  I do know that there's always a reason.

10  I hope one day God can reveal that to me.  I hope you

11  understand how hard of a decision it is for the past four

12  years to live in such isolation.  He's missed everything.

13  He's missed first days of school.  He's missed first baseball

14  games.  He missed his granddaughter's going to Regionals of

15  the World Series which he'll never be able to do again.  He's

16  missed many things.  And I can assure you that decision, to

17  make that decision to protect his family is much harder being

18  home and making that decision to protect us than him being

19  away and it not being an option.  He has lived without the

20  normal freedoms that we take for grant it so long and I truly

21  feel your sentencing will be just stripping more from our

22  family than from him at this point.

23        I thank you for your time.  Thank you.

24        THE COURT:  Thank you.  I think the law requires that

25  I give your client the opportunity whether he wants to say

1   anything.

2           MR. CIPPARONE:  Of course, your Honor.

3           THE COURT:  Mr. Nucera, you have a right to make a

4   statement before I impose sentence.  Your attorney advises me

01:03   5   that for various and good reasons that you have decided not to

6   do that.  If you do wish to make a statement before I impose

7   sentence, you may do so.  But all you need to do is indicate

8   to me that if that's what you'd like to do or indicate to your

9   lawyer that's what you'd like to do.  Would you like a make a

01:03   10  statement before I impose sentence?

11          DEFENDANT NUCERA:  No, your Honor.

12          THE COURT:  All right, thank you.  Let's take five

13  minutes.

14          MR. CIPPARONE:  Thank you, your Honor.  Sure.

01:04   15                      (Brief recess)

16      (The following took place back in open Court)

17          THE DEPUTY COURT CLERK:  All rise.

18          THE COURT:  Have a seat, please.  Mr. Cipparone

19  anyone else that you'd like to have speak at this time?  I

01:10   20  know you're going to be speaking and I look forward to hearing

21  what you have to say.  But anybody else?

22          MR. CIPPARONE:  No, your Honor, no further speakers

23  in that regard.

24          THE COURT:  All right.  Please proceed, sir.

01:10   25          MR. CIPPARONE:  Thank you, your Honor.  Some of this

01:10

01:11

01:11

01:11

01:12

1  will be disjointed in the sense that I'm going to respond to

2  some of the comments that Miss Lorber made and again I set out

3  my position.  So I'll start suggesting that the appropriate

4  sentence for Mr. Nucera will be some form of probation,

5  whether that includes house arrest as a component.  I would

6  urge the Court to impose a sentence of probation for the

7  reasons set forth in my sentencing memorandum.  But I'll

8  address first the Government's request for an upward variance

9  and why I contend that accepting the Court's determination of

10  the Guideline range of ten to 16 months for purposes of

11  today's proceeding and obviously any upward variance from that

12  would not be appropriate.

13      First the government provides its May 24th supplemental

14  letter to your Honor and I didn't respond in writing, but I

15  thought it would verbally just to address some of the points

16  that made therein.  I think that the cases the Government

17  cited in support of its argument for an upward variance are

18  really in apposite when you compare apples to apples.  In that

19  particular case in the Rodriguez Caraballo case that the

20  Government cited and expanded upon somewhat in its letter of

21  May 24th, the defendant there made a false statement under

22  oath to a Grand Jury.  Now a false statement is still a false

23  statement to the FBI but it is different than in front of a

24  Grand Jury and in a judicial proceeding making a false

25  statement.  So I would submit that that's distinguishable

1  factually, and in terms of the egregiousness of the context in

2  which it was made.  Certainly -- and I did not hear the

3  government contest this and I think implicit in what the

4  government said, it agrees that the FBI did not go down any

01:12  5  rabbit holes, and as a result of Mr. Nucera's denial of

6  touching Mr. Stroy that in no way is going to mislead the

7  investigation or obstruct the investigation.  Mr. Nucera by

8  that point is, it's clear from the trial evidence was

9  certainly the target of the investigation.  He was the only

01:12  10  suspect in the investigation.  That came out in

11  cross-examination of the Agent as well as the other witnesses.

12  And while I don't denigrate that it's serious to make a false

13  statement to the FBI in terms of its import, I think that is

14  substantially different than lying to a Grand Jury composed of

01:13  15  layman under oath in a judicial proceeding.  So I think for

16  that reason the Caraballo case is distinguishable.

17      The Government also refers to U.S. versus Dred which

18  affirmed a 12 month sentence for a jailer who lied to the FBI

19  about another officer's assault of a jail visitor.  What I

01:13  20  note about that case is it is dramatically lower than the

21  sentence the Government seeks in this case which is 48 months

22  in the Eugene Morris case, U. S. Versus Eugene Morris, a 24

23  month sentence for someone who made a false report about a

24  physical inmate, had an altercation with an inmate.  Again by

01:13  25  half lower than that which the Government seeks.  And in the

1  Carpenter case which I've already addressed to some extent was

2  a 30 month sentence, where a probation officer was convicted

3  of lying about his sexual abuse of a probationer.  And again

4  the underlying conduct that the Government is articulating

01:14  5  here is, again I'm not denigrating and I'm not conceding that

6  it happened.  Obviously Mr. Nucera has a retrial, but it is

7  not the equivalent by any stretch of sexually assaulting the

8  probationer that received a 30 month sentence.  Again 18

9  months than that which the government asks for Mr. Nucera.

01:14  10  So again, one, I don't believe those cases support an

11  upward variance in the context of Mr. Nucera's case.  Not only

12  the fact of what occurred here, but also the fact that his

13  life that your Honor has read about in his sentencing

14  memorandum and the attachments, but that, you know, I think no

01:14  15  one more eloquently than Christine Nucera did, just presented

16  to your Honor in context.  And your Honor I know does and will

17  sentence the whole person and that's what I urge the Court to

18  do.  This is a -- you know this is conduct of which Mr. Nucera

19  has been convicted is a snapshot in time of his life after a

01:15  20  life otherwise extremely well lived.  Again I'm not going to

21  belabor all the, you know, exhibits and recounting of those

22  positive aspects of Mr. Nucera's well lived life over, you

23  know, his entire life from a young child all the way up to the

24  current, but they are set forth in that sentencing memorandum

01:15  25  and particular in the appendix.  Mr. Nucera has, you know,

served admirably as a cop, as a police officer otherwise for
34 years rising to the rank of Chief.  That doesn't happen if
you're a bad cop by nature, if you're, you know, consistently
being complained of.  If you're consistently having
allegations of racial animus.  And although the government
says it paints a history of racial animus from these
conversations that we all heard and that were, you know,
admittedly, as I said to the jury, horrible language used.
They don't define who Mr. Nucera truly is.  And, you know, the
government hasn't, as it could at sentencing, presented a
history of disciplinary proceedings or citizen complaints
regarding Mr. Nucera's conduct as a police officer over
34 years.  It was laudable conduct as Mr. Hand indicated that
he observed firsthand for 23 years.  And Mr. Hand is a very
solid individual.  Your Honor heard him recount his history.
He's very well respected.  And he's here to tell the court his
perception of Frank Nucera.

So, I think an upward variance is not warranted.  The
government's recommended variance.  It is, and again I don't
think it's disparagingly but draconian given the context of
what Mr. Nucera has been convicted of in terms of the false
statement and is already encompassed by your Honor's findings
of the cross reference of 2H I think it's 1.1, if I'm not
misspeaking, 2H1.1.  That conduct, the underlying conduct of
which he hasn't been convicted but your Honor indicated you

1    would find by a preponderance of the evidence.  So addressing

2    it in that context is already accounted for in arriving at

3    that ten to 16 month Guideline range.  So when the government

4    asks for an upward variance, it's asking the Court to base it

01:17    5    on something that is already accounted for in arriving at that

6    ten to 16 month range.

7        Your Honor's heard Miss Nucera speak about the impact

8    that this had on Mr. Nucera.  It's been four plus years and if

9    anyone thinks that the social stigma, the vilification he's

01:17    10    received the self-exile from his family events.  The fact that

11    he is saddled with a life long felony conviction, that his

12    pension has been taken from him over the last four years with

13    no income, after a 34 year career based on an incident that

14    happened at the end of that career is not in any way punitive

01:18    15    and a deterrent than there's a turning of a willfully blind

16    eye to those attacks on Mr. Nucera and to the fact that they

17    do present a substantial deterrence to other persons similarly

18    situated.  I don't, I don't think it's fairly said that those

19    attacks would not would not deter other police officers from

01:18    20    engaging in similar conduct.  And again, your Honor, just to

21    be clear so Mr. Nucera understands when I talk about the

22    conduct, it's not that I'm acknowledging on his behalf that

23    the remaining count for, you know, trial occurs.  I'm

24    accepting your Honor's findings and I'm addressing them in the

01:18    25    context of that.  But I just want to for Mr. Nucera and the

1    record to be clear on that.

2        The collateral consequences of his conviction as I

3    referenced, you know, are you long, long consequences.  They

4    are not something that's going to go away.  I mean he's never

01:18    5    going to serve as a police officer again.  He was held in high

6    esteem in that regard and that's all gone.  And that's a

7    consequence of his conduct as a consequence, but it's still a

8    consequence and it's still -- it certainly is a specific

9    deterrence and I don't think there's any real dispute that Mr.

01:19    10    Nucera is, one, is not in a position of recidivism, not a

11    police officer he will never be.  And, two, it's you know what

12    kind of person he is and hearing that.  He's not likely to

13    recidivate anyway.  And he also falls squarely within the

14    demographic in terms of the age group that the U. S.

01:19    15    Sentencing Commission have shown are the least likely to

16    recidivate.  So I don't think from a specific deterrent

17    perspective that's a substantial concern respectfully.  I

18    understand the government's, you know, argument about general

19    deterrence, but I do think that a sentence substantially lower

01:19    20    than the government is seeking and one frankly lower than the

21    Guideline range still can account for general deterrence.  For

22    all of those reasons in terms of the attendant collateral

23    consequences.  And, you know, the government and I were

24    discussing them and we'll address this again, you know, for

01:20    25    example the forfeiture of Mr. Nucera's weapons.  They have to

01:20

01:20

01:20

01:21

01:21

1    now be transferred to his son and he'll never be able to use

2    it as a weapon.  And when I say weapon, a firearm.  And so he

3    doesn't have that for self-protection as a military person, a

4    police officer that he carried firearms for over thirty-some

5    years.  He can't even protect his family in their own homes

6    anymore in that regard.  That's a consequence.  That may seem

7    minor but it's not if you're used to that your entire life.

8    If you're used to being that County level walking down the

9    street with your head held high because of all the charitable

10   good work you did, he now walks with his head held low if he

11   walks at all, as you heard Christine Nucera talk about.  And,

12   frankly, having interacted with Mr. Nucera over several years,

13   I don't think that's going to go away anytime soon.  I don't

14   think he's going to, knowing his personalty he's going to walk

15   with his head held up high and not feel that change in that

16   self isolation for a long time if ever.  And I'm hopeful and

17   I'm urging your Honor not to impose incarceration, but I do

18   want to address it if your Honor were inclined to do that, I

19   don't think we can also turn a blind eye to that a former

20   police officer who is accused of, you know, the crime that

21   which he's accused of will not serve easy time incarcerated.

22   It's going to be harder time than many other people serve for

23   different types of crimes.  That's something I think your

24   Honor can and should consider when calculating what the

25   appropriate sentence is.  You know, I don't want to rely on

|      |    |                                                                      |
|------|----|----------------------------------------------------------------------|
|      | 1  | that fact and not address it today.  I think it's just               |
|      | 2  | pragmatic, unfortunate but a pragmatic reality of, you know,          |
|      | 3  | incarceration in that context.  And certainly in, you know,          |
|      | 4  | the social climate that we're in today I think the landscape         |
| 01:21 | 5 | has really changed since we were last here, and I don't want         |
|      | 6  | to be unmindful of that.  I'd ask the court to consider again        |
|      | 7  | his long-standing service as a military person, as a police          |
|      | 8  | officer, as a Township Administrator.  He wore a lot of hats,        |
|      | 9  | and he really, you know, he's an intelligent person, he's a          |
| 01:22 | 10 | smart person.  He could have, you know, been a business person      |
|      | 11 | where he earns a lot more money, where he built up a different       |
|      | 12 | life for his family, but service was so important to him if we       |
|      | 13 | look at, you know, what, what effect that has had on his             |
|      | 14 | family.  His son is a lieutenant with the Bordentown Township        |
| 01:22 | 15 | Police Department.  His daughter works closely with drug            |
|      | 16 | addiction persons and the Burlington County Prosecutor's             |
|      | 17 | Office.  They believe in life service as well and that's been        |
|      | 18 | because of the example that Mr. Nucera set in all the ways           |
|      | 19 | that's been described to your Honor.  And that's something, I        |
| 01:22 | 20 | think that the court should consider, and I understand you're       |
|      | 21 | going to consider the nature and seriousness of the crime.          |
|      | 22 | I'm not denigrating that.  I understand you're going to -- but       |
|      | 23 | I ask you to balance all of those things.  I know you will,          |
|      | 24 | your Honor.  And so the -- but he's clearly otherwise lived a        |
| 01:23 | 25 | what I described in my sentencing memorandum as a well lived        |

01:23

01:23

01:24

01:24

01:24

1  life.  And I know the government contends that, you know, you

2  know, your sentence somehow a send a message to people like,

3  like Mr. Roar who testified, but, you know, that's a little

4  bit of a mixed bag.  Mr. Roar certainly and I think the

5  evidence bears this out, had some personal motivations for

6  doing what he did as well.  He wasn't completely a white hat

7  police officer unmotivated by -- and again I'm not denigrating

8  him, I'm just calling it at least as I see it from the way it

9  definitely developed.  But, you know, there were many other

10 things that could have represented to your Honor in terms of

11 for example commendations, but -- and I tried to get these.

12 When Mr. Nucera left his office and Your Honor knows the

13 context in which that was, it was rather hurried, meaning

14 there was charges that were imminent.  He had to resign.

15 Those things were left in the office.  I tried during the

16 trial to communicate with the Township, the attorney and those

17 things are gone.  We don't know where they are.  So there were

18 a lot of things that we could have presented to your Honor.

19 So some of this stuff we presented was a little bit older.

20 It's what Mr. Nucera had in his files but there was a lot more

21 than there were, you know, just not whatever happened to them,

22 they went into, you know, some hole in the Township and nobody

23 knows where they went.  I'm not disparaging the Township.  I

24 tried to get them, they just -- I was told they don't exist

25 anymore.  Nobody knows where they are, but there were more and

1   you would imagine there were.  And, again, you know, while the

2   government attempts to paint Mr. Nucera as a historically, you

3   know, bad cop in some ways I guess if I put it in common

4   parlance, they haven't presented any kind of history in that

01:24   5   regard.  They presented the count now seven times, the trial

6   evidence, you know, asserted.  They could have done it at

7   sentencing if it was available.  I don't think -- it's not

8   available or they would have presented it.  So certainly I

9   don't think your Honor should put any stock in that.

01:25   10        Beyond that, your Honor, I'm going to ask the court to

11   rely on, you know, the aspects of my sentencing memorandum to

12   vary downward from the Guideline ranges that your Honor has

13   found applicable here of ten to 16 months and to impose a

14   sentence of probation, perhaps community service and house

01:25   15   arrest.  That would clearly send an adequate general and

16   specific deterrence at least and in combination with all of

17   those other collateral consequences I've already addressed.

18   And I want to be careful how I say this, I don't want to --

19   not the least of which is a financial impact, of even having

01:25   20   to occur the substantial legal fees that he has you know as

21   well as an inexpensive process, took a lot of time and effort.

22   That sends an adequate message in the context for punishment

23   for Mr. Nucera.  Thank you, your Honor.

24        THE COURT:  Anything else?

01:25   25        MR. CIPPARONE:  No, your Honor.  Thank you.

```
 1          THE COURT:  Anything further from the Government?
 2          MS. LORBER:  No, your Honor.
 3          THE COURT:  All right.  This is the third and final
 4   stage of the process.  The time in which the court needs to
 5   make findings under the statute which is Section 3553(a).
 6          Let me begin by referring to a couple policy statements
 7   in the Sentencing Guidelines which I think are applicable
 8   which I think help guides the Court in determining what's a
 9   fair sentence in this case.  The first is 5K2.9.  And it
10   reads:  That the defendant committed the offense in order to
11   facilitate or conceal the commission of another offense, the
12   Court may increase the sentence above the Guideline range to
13   reflect the actual seriousness of the defendant's conduct.
14          You look to the Eighth Circuit case of U. S. Versus
15   Richard R-i-c-h-a-r-d which is at 662 F3rd, 1037, 2011.  The
16   Court wrote about people typically who violate Section 1,001
17   by lying about whether they had paid a tax for instance or had
18   written a check.  In that case the defendant had lied to
19   cover-up for the facts that she had murdered her niece.  And
20   the court talked about those kinds of things are significantly
21   different from the norm of lying about your taxes, and lying
22   about whether you had sent a check.  Such that 5K2.9 would
23   apply.  I think similarly it applies to this case.  The
24   defendant clearly lied in an effort to cover-up on an assault
25   he perpetrated while the Chief of Police on a handcuffed
```

01:26 (line 5)
01:26 (line 10)
01:26 (line 15)
01:27 (line 20)
01:27 (line 25)

| | | |
|---|---|---|
| | 1 | victim.  So while we're not talking about a murder here, his |
| | 2 | lies differ significantly from the norm.  And the second one |
| | 3 | and the defense counsel in his brief objects to this, who |
| | 4 | takes issue with it I should say.  And the government mentions |
| 01:28 | 5 | it but really doesn't reply and I do because I think it's |
| | 6 | important.  And that's 5K2.7 destruction of government |
| | 7 | function.  If a defendant's conduct resulted in a significant |
| | 8 | disruption of a governmental function, the Court may increase |
| | 9 | the sentencing above the authorized Guideline as to reflect |
| 01:28 | 10 | the nature and extent of the disruption and the importance of |
| | 11 | the governmental function affected.  We go back to history, in |
| | 12 | our history at the very beginning, the very origins of society |
| | 13 | where the anthropologists will tell you that humans came |
| | 14 | together as societies in order to better survive.  And that |
| 01:29 | 15 | led to a need to structure these societies which we call |
| | 16 | government.  There needs to be some kind of regulation of |
| | 17 | society.  And over the ages and the centuries and years which |
| | 18 | we've had all kinds of government, kings and Pharos, Despots |
| | 19 | and Dictators and they developed this idea of Democracy with |
| 01:29 | 20 | consent of the government and then we have this wonderful |
| | 21 | experiment on this continent called the United States as |
| | 22 | embodied in the Declaration of Independence and our |
| | 23 | Constitution.  And the concept is All Men Are Created Equal. |
| | 24 | Therefore, all men and women are to be treated equally without |
| 01:30 | 25 | regard to race or color or creed.  Admittedly we're a long way |

01:30

01:31

01:32

01:32

01:33

|     |     |
| --- | --- |
| 1 | from that ideal and we're a work in progress.  The government |
| 2 | exists, this government exists and should exist in part to |
| 3 | enforce that promise and dispense justice without regard to |
| 4 | color or race.  And when the Government through a high |
| 5 | official such as a Chief of Police fails in that essential |
| 6 | requirement by using race to impose illegal punishment, that |
| 7 | to me is a significant disruption and one of the purposes of |
| 8 | Government.  And isn't that why we condemn the segregation |
| 9 | laws over the past?  Isn't that why we condemn and attack |
| 10 | racial profiling?  It's because of this corrosive effect that |
| 11 | these things and the acts of this defendant have on Government |
| 12 | and its relation to its people.  So I think those both apply |
| 13 | in this case.  So the nature and circumstances of the offense. |
| 14 | Well, I mean it's not terribly complicated.  It's set forth in |
| 15 | the Presentence Investigation Report.  And the Probation |
| 16 | Department did its usual stellar job of setting out what |
| 17 | happened here.  That the victim was assaulted by the defendant |
| 18 | Chief of Police because of his race is clear to me that that's |
| 19 | what happened. |
| 20 | The history and characteristics of the defendant.  This |
| 21 | is where it gets very complicated.  We know about his health |
| 22 | issues.  We don't need to get into that.  His military |
| 23 | service.  His career in law enforcement.  Chief of Police and |
| 24 | he became the Township Administrator.  He has strong family, |
| 25 | community ties, an impressive outpouring of support through |

1   the letters from family and friends attesting to his good

2   works and his charity to others.  He's a man who undoubtedly

3   is loved and admired by many people.  It couldn't have been

4   easy for him to ask these people, given the circumstances to

01:33   5   write letters to me on his behalf.  He's now lost everything,

6   his career, probably his pension.  His finances have been

7   tattered.  He has lifetime status now a convicted felon as a

8   racist, as a liar.  The career he had also lives are tattered

9   as evidenced by his daughter's heartfelt statement.  His

01:34   10   family has been destroyed because of what he did.  And these

11   are not insignificant considerations fashioning a just

12   sentence.  But these collateral consequences are merely part

13   of the equation that I must examine.  And I can't agree with

14   Mr. Cipparone's characterization that these racist outbursts

01:34   15   occurred late in his career.  The testimony from the officers

16   was that it was going on for some time.  I mean remember the

17   testimony about the police dogs at the high school basketball

18   games because the other team and its fans were people of

19   color.  We had the testimony from the motel manager that she

01:35   20   kept complaining to the Township's Government about his acts

21   and his statements after she at the motel had hosted events

22   which were attended by people of color.  The cops knew about

23   him.  The people running the Township knew about Nucera, about

24   him for some time, but it's still just incomprehensible to me

01:35   25   how he was able to advance through the ranks all the way to

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | Chief and Township Administrator.                                      |
|       | 2  | Seriousness of the offense.  The need to promote                       |
|       | 3  | respect for the law and to provide just punishment.  This is a         |
|       | 4  | very serious crime.  The general public has suffered an                |
| 01:36 | 5  | incalculable harm.  His words and his deeds caused great harm          |
|       | 6  | to the public perception of the criminal justice system.  He          |
|       | 7  | has no prior record.  There's no longer a danger to the                |
|       | 8  | community.  He cannot impose his will on others through misuse         |
|       | 9  | of his badge any longer.  And unfortunately I can't change his         |
| 01:37 | 10 | heart.  More importantly, and perhaps most important is the            |
|       | 11 | concept of general deterrence.  It must be clear and made              |
|       | 12 | clear to police officers across the nation and to the public          |
|       | 13 | that this kind of behavior is categorically unacceptable and          |
|       | 14 | will not be tolerated.  An officer to receive too lenient a           |
| 01:37 | 15 | sentence.  I believe the public will lose confidence in the           |
|       | 16 | integrity of our justice system and rightfully so.  Given the         |
|       | 17 | risk, the future harm to the public if this kind of conduct is        |
|       | 18 | not punished sufficiently and thus deterred, serious                   |
|       | 19 | consequences must follow.  Defendant's actions to engender            |
| 01:38 | 20 | respect for our laws and deter others from engaging in similar        |
|       | 21 | acts.  I want to be clear that this holds true even without           |
|       | 22 | the racism evidenced in this case.  Chief of Police simply           |
|       | 23 | cannot lie to the FBI about a very important matter.  It also         |
|       | 24 | needs to be said while discussing the concept of deterrence,         |
| 01:38 | 25 | it's not just police officers who need to be deterred but it         |

01:39

1   is also government officials who might consider hiring or

2   promoting someone who shares his odious racist world view.

3   Both sides argued extensively about sentence disparity and

4   rightfully so.  And they present to me cases that demonstrate

5   sentences that they believe align with their position and what

6   they think this outcome should be.  The government most

7   recently citing the Carpenter case and the Brezna case.

8   Defense counsel makes a point that this case is not comparable

9   to Carpenter in which there was a 30 month sentence.  Because

01:39

10  that case the underlying crime involved sexual abuse on

11  probation.  I'm not sure I agree that this hierarchy of crimes

12  and that somehow sexual abuse is worse than these racist acts.

13  And let's not forget he was the Chief of Police, not a

14  probation officer, not a patrolman or patrolman, patrol woman

01:40

15  officer.  Whatever.  But these case citations are not really

16  of significant help because of the unique facts of this case.

17  So where does that leave us?  After careful consideration of

18  the facts and the sentencing factors by statute and under the

19  Guidelines, this Court is convinced that only a sentence of a

01:41

20  term of imprisonment reflects the seriousness of this crime.

21  And let me repeat, even without the racism angle of this case,

22  a period of incarceration is called for.  And let me also

23  repeat the sentence I impose is not at all dependent on a

24  resolution of the offense level.  It is arrived at by a

01:41

25  careful consideration of the Section 3553A factors.  I believe

1    the sentence to be a sentence that he deserves.  I believe it

2    to be sufficient but not greater than necessary.  I believe it

3    promotes respect for all of our laws and it serves to deter

4    others.

01:42   5        Mr. Nucera, would you please stand up if you're able?

6            Pursuant to the Sentencing Reform Act of 1984 is it the

7    judgment of this court that you, Frank Nucera, are hereby

8    committed to the custody of the Bureau of Prisons to be

9    imprisoned for a term of 28 months.  Upon release from

01:42   10   imprisonment, you're placed on supervised release for a term

11   of two years, which means that within 72 hours of release from

12   custody, you must report in person to the Probation Office in

13   the District in which your are released.  While on supervised

14   release you must not commit any other Federal, State or Local

01:43   15   crime.  You must not possess any firearm or other dangerous

16   device.  You must not possess any illegal controlled substance

17   and you must comply with the other mandatory and standard

18   conditions that have been adopted by this Court.  Based on the

19   information that we know, you are excused from the mandatory

01:43   20   drug testing provisions.  However, you may be requested to

21   submit to drug testing during the period of supervision if

22   probation thinks there's a risk of substance abuse.  I will

23   not impose a fine in this matter.  A period of incarceration

24   is sufficient.  Furthermore his financial affairs wouldn't

01:43   25   support it.  However, he must pay a special assessment of $100

1   which is due immediately.  I order that he present himself to

2   the institution designated by and on the date set by the

3   United States Bureau of Prisons.  I will recommend to the

4   Bureau of Prisons that they designate a facility for service

01:44   5   of his sentence as near as possible to his home address.

6            You have fourteen days in which to appeal.

7            Is there anything further in this matter?

8            MR. CIPPARONE:  Judge, can I address something before

9   we get to the weapons?  Your Honor agreed, indicated the

01:44   10   surrender would not occur until after the re-trial.  I'm

11   assuming that's still the case.  I don't want to make an

12   assumption though.

13            THE COURT:  I'm fine with that.

14            MR. CIPPARONE:  Okay.

01:44   15            THE COURT:  The government has to make that decision

16   what they want to do.

17            MR. CIPPARONE:  Only because you had indicated on a

18   date to be set by the Bureau of Prisons.  A date indicated by

19   the Bureau of Prisons.  So I wanted to get it clarified by

01:44   20   your Honor.

21            THE COURT:  I put in that language on or after the

22   termination of the pending charges.

23            MR. CIPPARONE:  Thank you, Your Honor.  I appreciate

24   that.  I didn't mean to interrupt Miss Lorber.

01:44   25            THE COURT:  Okay.

1    MS. LORBER:  Your Honor, the FBI -- upon the initial

2    complaint being lodged against the defendant?  The FBI took

3    possession of all his firearms and ammunition, and those are

4    still certainly in the FBI's possession.  The current

01:45    5    Probation agreement that the FBI will release those firearms

6    to the defendant's son, Frank Nucera the Third.  But they need

7    an Order from the court stating that it's permissible for them

8    to do so.

9    THE COURT:  Yes.

01:45    10    MS. LORBER:  I can submit a Proposed Order to the

11    court for you to sign, but if you could also state on the

12    record that by agreement between the parties the firearms are

13    to be transferred and the Court is so ordering?  That would be

14    helpful.

01:45    15    THE COURT:  The Court orders that the firearms be

16    transferred in accordance with the agreement between the

17    parties.

18    MS. LORBER:  And additionally there is a -- the FBI

19    also has possession of one State of New Jersey Firearms

01:46    20    purchase identification card that belongs to the defendant.

21    We would ask for the Court to order that it be destroyed

22    simply because he can no longer obtain firearms legally in the

23    State of New Jersey and I'll put that in the Proposed Order as

24    well.

01:46    25    THE COURT:  Is there an expiration date on there?

**A.78**

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | MR. CIPPARONE:  I don't believe firearms Id cards                    |
|       | 2  | have expiration dates, your Honor.  So, there's no objection         |
|       | 3  | to it being destroyed.  I just would like it in an order so          |
|       | 4  | that later if any -- because what happens usually is when            |
| 01:46 | 5  | you're no longer eligible, you're supposed to turn it in to          |
|       | 6  | the State Police.  I just don't want there to be a problem           |
|       | 7  | later that Mr. Nucera has.  So I just want an order that the          |
|       | 8  | FBI is destroying it, I think we're fine.                            |
|       | 9  | THE COURT:  The order shall so indicate that the FBI                 |
| 01:46 | 10 | shall destroy the firearm purchaser ID card.                         |
|       | 11 | MS. LORBER:  Thank you, your Honor.  That's all I                    |
|       | 12 | have.                                                                |
|       | 13 | THE COURT:  All right.  Thank you, everybody.                        |
|       | 14 | MR. CIPPARONE:  Thank you, your Honor.                               |
| 01:47 | 15 | THE DEPUTY COURT CLERK:  All rise.                                   |
|       | 16 | (The matter was then concluded)                                      |
|       | 17 |                                                                      |
|       | 18 |                                                                      |
|       | 19 |                                                                      |
|       | 20 |                                                                      |
|       | 21 |                                                                      |
|       | 22 |                                                                      |
|       | 23 |                                                                      |
|       | 24 |                                                                      |
|       | 25 |                                                                      |

1  I certify that the foregoing is a correct transcript from the

2  record of proceedings in the above-entitled matter.

3

4  */S/ Carl Nami, Official Court Reporter*

5

6  *Court Reporter/Transcriber_____*

7  *October 22, 2021*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*Camden, New Jersey*

**A.80**

AO 245B (Mod. D/NJ 12/06) Sheet 1 - Judgment in a Criminal Case

Date Filed: 02/14/2022     Page: 84     Document: 25     Case: 21-2115

# UNITED STATES DISTRICT COURT
## District of New Jersey

UNITED STATES OF AMERICA

v.

FRANK NUCERA, JR.

Defendant.

**CASE NUMBER    1:17-CR-00532-RBK-1**

### JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, FRANK NUCERA, JR., was represented by ROCCO C. CIPPARONE, ESQ.

The defendant was found guilty on count 3 of the Indictment by a jury verdict on 10/9/2019 after a plea of not guilty. Accordingly, the court has adjudicated that the defendant is guilty of the following offense:

| Title & Section | Nature of Offense | Date of Offense | Count Number |
|---|---|---|---|
| 18 U.S.C. § 1001(a)(2) | False Statements | 12/22/2016 | 3 |

As pronounced on May 26, 2021, the defendant is sentenced as provided in pages 2 through 5 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 and 18 U.S.C. § 3553(a).

It is ordered that the defendant must pay to the United States a special assessment of $100.00 for count 3, which shall be due immediately. Said special assessment shall be made payable to the Clerk, U.S. District Court.

It is further ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of any material change in economic circumstances.

Signed this ___27___ day of May, 2021.

Robert B. Kugler
U.S. District Judge

08505

# A.81

AO 245B (Mod. D/NJ 12/06) Sheet 2 - Imprisonment

Judgment - Page 2 of 5

Defendant: FRANK NUCERAJR.
Case Number: 1:17-CR-00532-RBK-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 28 months.

The Court makes the following recommendations to the Bureau of Prisons: the Court recommends that the Bureau of Prisons designate defendant to a facility as close as possible to his home address.

The defendant will surrender for service of sentence at the institution designated by the Bureau of Prisons on a date after the resolution of the pending charges, the exact date and time to be determined by the Bureau of Prisons..

## RETURN

I have executed this Judgment as follows:

_____
_____
_____
_____

Defendant delivered on _____ To _____
At _____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

**A.82**

AO 245B (Mod. D/NJ 12/06) Sheet 3 - Supervised Release

Judgment - Page 3 of 5

Defendant: FRANK NUCERA JR.
Case Number: 1:17-CR-00532-RBK-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of 2 years.

Within 72 hours of release from custody of the Bureau of Prisons, you must report in person to the Probation Office in the district to which you are released.

While on supervised release, you must not commit another federal, state, or local crime, must refrain from any unlawful use of a controlled substance and must comply with the mandatory and standard conditions that have been adopted by this court as set forth below.

Based on information presented, you are excused from the mandatory drug testing provision, however, you may be requested to submit to drug testing during the period of supervision if the probation officer determines a risk of substance abuse.

You must cooperate in the collection of DNA as directed by the probation officer

If this judgment imposes a fine, special assessment, costs, or restitution obligation, it is a condition of supervised release that you pay any such fine, assessments, costs, and restitution that remains unpaid at the commencement of the term of supervised release.

Case: 21-2115    Document: 25    Page: 86    Date Filed: 02/14/2022

**A.83**

AO 245B (Mod. D/NJ 12/06) Sheet 3a - Supervised Release

Judgment - Page 4 of 5

Defendant: FRANK NUCERA JR.
Case Number: 1:17-CR-00532-RBK-1

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4) You must answer truthfully the questions asked by your probation officer.

5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have fulltime employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

**A.84**

AO 245B (Mod. D/NJ 12/06) Sheet 3a - Supervised Release

Judgment - Page 5 of 5

Defendant: FRANK NUCERA JR.
Case Number: 1:17-CR-00532-RBK-1

## STANDARD CONDITIONS OF SUPERVISION

13) You must follow the instructions of the probation officer related to the conditions of supervision.

*For Official Use Only - - - U.S. Probation Office*

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision or (2) extend the term of supervision and/or modify the conditions of supervision.

These conditions have been read to me.  I fully understand the conditions, and have been provided a copy of them.

You shall carry out all rules, in addition to the above, as prescribed by the Chief U.S. Probation Officer, or any of his associate Probation Officers.

(Signed)_____
               Defendant                             Date


_____
U.S. Probation Officer/Designated Witness          Date

Case: 21-2115     Document: 25     Page: 88     Date Filed: 02/14/2022

**A.85**